UNITED STATES of America,
Plaintiff-Appellee,

v.

Stephan KASOURIS, Sandra Lee Serifovski, a/k/a Sandra Lee McLamb,
Defendants-Appellants.

No. 71–3569.

United States Court of Appeals,
Fifth Circuit.

March 7, 1973.

Raymond E. LaPorte, Tampa, Fla., for Kasouris.

Thomas D. Casper, Tampa, Fla. (Court-appointed), for Serifovski.

John L. Briggs, U. S. Atty., Jacksonville, Fla., Bernard H. Dempsey, Jr., Claude H. Tison, Jr., Asst. U. S. Attys., Tampa, Fla., for plaintiff-appellee.

Before JOHN R. BROWN, Chief Judge, and TUTTLE and INGRAHAM, Circuit Judges.

INGRAHAM, Circuit Judge:

Appellants Stephan Kasouris and Sandra Lee McLamb (now Serifovski) were indicted for conspiring to conceal material facts in an effort to defraud the Immigration and Naturalization Service of the United States. They were convicted for arranging a fraudulent marriage between Sandra and Kadri Serifovski for the purpose of qualifying Kadri, an alien, for the status of permanent resident. In pursuit of this scheme they conspired to execute change of status forms at the Immigration Office without disclosing the understanding that the marital partners would not live together as man and wife.

The trial tactics of the prosecutor, as evidenced by the record, indicate a disregard for the fundamentals of due process. Accordingly, the convictions must be reversed.

Kadri Kani Serifovski, a citizen of the Macedonian Province of Yugoslavia, entered the United States on December 28, 1968, under a Class B-2 visa which entitled him to remain for a period of six months. Kadri traveled to the home of his uncle in Clearwater, Florida. He there expressed a desire to seek status as a permanent resident since he had developed an abiding love for this country and feared returning to his communist homeland.

Neim Abdullaj, Kadri's distant relative, questioned Dominic Titone, a local truck driver, about the possibility of finding a suitable marital partner for Kadri. Titone subsequently replied, intimating that he knew of an American citizen who was favorably inclined towards the proposal. Titone added: "It is going to cost us some money."

As a consequence of this conversation Sandra and Kadri were introduced at a restaurant in St. Petersburg. A wedding was arranged and Kadri delivered $1000 to a lawyer, believing that a monetary gift to a bride was customary practice. The lawyer paid Sandra $50 for expenses and held the remaining sum in escrow to be given to Sandra following the marriage ceremony. Sandra was living with co-appellant Kasouris at all times material to this case.

Following a brief wedding ceremony, the small group assembled at the home of Kadri's uncle. After conversing for approximately one-half hour, Sandra and Kasouris departed without a word of explanation to her groom. The newlyweds never lived together nor has the marriage ever been consummated.

Kadri was contacted by Immigration officials and was asked to appear with his wife to execute an application for reclassification of status. Kadri contacted Kasouris, who informed him that Sandra was in California and would need $340 for air fare to return. In fact, Sandra had not been in California but was living with Kasouris in St. Petersburg Beach. Unaware of the deception, Kadri raised and delivered $300 to the lawyer's office where it was eventually picked up by Kasouris. Kasouris se-

cured the additional $40 from Neim Abdullaj.

Thereafter, Sandra appeared at the Immigration Office and filed the requisite forms which were subsequently approved.

■ During the course of the trial the prosecutor had assured the court and defense counsel that all Jencks Act statements of government witnesses would be tendered to the court.[1] When asked if there was a Jencks Act statement regarding the witness Amza Abdullaj, the prosecutor replied that there was none, predicating his belief on the unsupported assumption that the document in his possession had not been signed nor adopted. The defense later renewed the request for production of the statement. At this time, the prosecutor reexamined his files and found the statement had indeed been signed.

Once the document had been delivered and was found by the court to be a Jencks statement, defense counsel moved for a mistrial. The judge denied the motion but did strike the testimony of the subject witness. Under the facts of this case, we feel that the interests of justice required the declaration of a mistrial.

The following quote from the Supreme Court's decision in Palermo v. United States, 360 U.S. 343, 354, 79 S.Ct. 1217, 1225, 3 L.Ed.2d 1287 (1959), evidences the affirmative duty on the part of the prosecutor to deliver up statements which the prosecutor doubts are within the coverage of the Jencks Act:

"3. The statute itself provides no procedure for making a determination whether a particular statement comes within the terms of (e) and thus may be produced if related to the subject matter of the witness' testimony. Ordinarily the defense demand will be only for those statements which satisfy the statutory limitations. Thus the Government will not produce documents clearly beyond the reach of the statute for to do so would not be responsive to the order of the court. However, when it is doubtful whether the production of a particular statement is compelled by the statute, we approve the practice of having the Government submit the statement to the trial judge for an *in camera* determination. Indeed, any other procedure would be destructive of the statutory purpose."

In the present case the government urges that nonproduction was due solely to the mere inadvertence of the prosecutor in failing to examine the document. Having been put on notice of the possibility that the statement fell within the Act, the prosecutor should have immediately tendered the document to the court for judicial scrutiny rather than adamantly denying the existence of a statement within the coverage of the Act. Failing to do so, the prosecutor had led us to believe that what may once have been characterized as mere inadvertence had over a period of two days of repeated demands and assurances turned toward deliberate suppression.

■ The statute does not vest in the government the unilateral power to determine without judicial supervision the question of whether or not the statement falls within the purview of the statute. When a controverted question of that kind arises, it is for judicial determination with the judge acting as arbiter. Bary v. United States, 292 F.2d 53 (10th

---

1. The Jencks Act, 18 U.S.C. § 3500(e) defines a statement as follows:

"The term 'statement', as used in subsections (b), (c), and (d), of this section in relation to any witness called by the United States, means—

"(1) a written statement made by said witness and signed or otherwise adopted or approved by him; or

"(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness to an agent of the Government and recorded contemporaneously with the making of such oral statement."

Cir., 1961). Upon proper demand the issue of a statement's susceptibility to production is controverted.

Paragraph (d) of 18 U.S.C. § 3500, provides as follows:

> "If the United States elects not to comply with an order of the court . . . to deliver to the defendant any such statement, or such portion thereof as the court may direct, the court shall strike from the record the testimony of the witness, and the trial shall proceed unless the court in its discretion shall determine that the interests of justice require that a mistrial be declared."

The prosecutor's failure to deliver the document when first requested is deemed to be an implied election not to produce. While the trial court in the exercise of its discretion felt that a motion to strike the testimony of the witness was the appropriate remedy, we feel that the court should have gone one step farther and declared a mistrial.

■ The appropriate relief for a violation of the discovery rules lies within the discretion of the district court, yet the error may be so prejudicial to the substantial rights of the defendant as to necessitate a reversal. United States v. Saitta, 443 F.2d 830 (5th Cir., 1971), cert. denied, 404 U.S. 938, 92 S.Ct. 269, 30 L.Ed.2d 250 (1971).

Here the denial of an opportunity to impeach the highly damaging testimony of a government witness caused by the breach of the prosecutor's duty to tender the statement to the court necessitates a reversal of Kasouris's conviction.

■ Not content with proving the substantive elements of the offenses charged in the indictments, the prosecutor decided to bolster his case by eliciting testimony with regard to other acts of misconduct allegedly committed by both appellants. The overly broad application of the Similar Acts Doctrine employed in the trial court requires that both convictions be reversed and remanded.

The court allowed the prosecutor to examine witnesses with regard to Sandra's purchase of traveler's checks with the money she had received from Kadri. The prosecutor sought to show that Sandra had applied for a refund on the checks, fraudulently claiming that she had lost them. The prosecutor also sought to prove that both Sandra and Kasouris were engaged in a joint effort to extort money from a man in California under threat of releasing embarrassing photographs of the victim.

The judge ruled that evidence of the alleged acts was admissible under the Similar Acts Doctrine in order to establish the requisite intent to defraud the United States and negate the appellant's allegation of innocence.

■ As a general rule the admission of a defendant's prior acts of misconduct or illegal activities, for which he is not on trial, is not permitted. A well settled exception to the rule exists where prior similar acts are introduced to establish the requisite knowledge or intent to commit the act for which he is being tried. United States v. Alston, 460 F.2d 48 (5th Cir., 1972). The exception contemplates that the prior acts would in fact be similar. Similarity, being a matter of relevancy, is judged by the degree in which the prior act approaches near identity with the elements of the offense charge. There is no necessity for synonymity but there must be *substantial* relevancy for purposes other than to show the probability that the person committed the offense being tried because he is a man of criminal character. United States v. Johnson, 453 F.2d 1195 (5th Cir., 1972). To hold otherwise would allow the exception to engulf the rule.

In the present case, we need not decide the questionable admissibility of the testimony about the traveler's checks since the admission of evidence regarding the alleged extortion attempt was an abuse of discretion. The connection between the crime charged and the alleged extortion is tenuous at best. The preju-

dicial effect of this testimony far outweighed any proper benefit to the prosecution.[2]

The judgment of the district court is reversed and the case remanded for further proceedings not inconsistent with this opinion.

Reversed and remanded.

2. Our holding today is consistent with the Federal Rules of Evidence:

> Rule 403.
> EXCLUSION OF RELEVANT EVIDENCE ON GROUNDS OF PREJUDICE, CONFUSION, OR WASTE OF TIME
> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

> Rule 404.
> CHARACTER EVIDENCE NOT ADMISSIBLE TO PROVE CONDUCT; EXCEPTIONS; OTHER CRIMES
> * * * * *
> (b) *Other crimes, wrongs, or acts.* Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. This subdivision does not exclude the evidence when offered for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.