**UNITED STATES of America,
Appellee,**

v.

**Guillermo Aliro PEREZ, Defendant–
Appellant.**

**Docket No. 02–1240.**

United States Court of Appeals,
Second Circuit.

Argued: Dec. 13, 2002.

Decided: April 4, 2003.

Steven L. D'Alessandro, Special Assistant United States Attorney, Brooklyn, New York (Roslynn R. Mauskopf, United States Attorney for the Eastern District of New York, Jo Ann M. Navickas, Assistant United States Attorney, Brooklyn, New York, on the brief), for Appellee.

Victor Toribio, New York, New York, for Defendant–Appellant.

Before: KEARSE, SACK, and RAGGI, Circuit Judges.

KEARSE, Circuit Judge.

Defendant Guillermo Aliro Perez appeals from a final judgment entered in the United States District Court for the Eastern District of New York following a jury trial before Edward R. Korman, *Chief Judge,* convicting him of failing to file a currency report, in violation of 31 U.S.C. § 5316(b), and making a false statement to the government, in violation of 18 U.S.C. § 1001(a)(2), and sentencing him principally to 24 months' imprisonment, to be followed by a three-year term of supervised release. On appeal, Perez contends principally (1) that he was denied the effective assistance of counsel because his attorney, who had also been his employer, (a) was a

potential witness at trial, and (b) was representing another person who had been charged with a similar offense; and (2) that the trial court erred in allowing Perez to be cross-examined with respect to that other person's conduct. For the reasons that follow, we find no merit in any of Perez's contentions, and we affirm the judgment.

## I. BACKGROUND

On September 27, 2000, at John F. Kennedy International Airport ("JFK"), as Perez prepared to board a flight to the Dominican Republic, a customs inspector advised him of the federal requirement that he file a report if he was about to transport from the United States monetary instruments totaling more than $10,000 ("currency report"), *see* 31 U.S.C. § 5316. Perez proceeded to sign a form declaring that he was carrying a total of $830. A routine X-ray examination of his luggage, however, showed that one bag contained five aerosol cans, and closer inspection revealed that the cans contained United States currency totaling $210,000. In all, Perez was found to be in possession of approximately $211,335. He was arrested for violating the currency report requirement and was eventually indicted on that charge and on one count of making a false statement to the government, in violation of 18 U.S.C. § 1001(a)(2).

From early September 2000 until the time of his arrest, Perez was employed as a paralegal by Ramon W. Pagan, Esq. After his arrest, Perez was represented in the present criminal proceeding by Pagan. At that time, Pagan was also representing one Andres Almonte. On September 19, 2000, eight days prior to Perez's arrest, Almonte had been arrested at JFK as he prepared to board a flight to the Dominican Republic and was charged with having failed to file an accurate currency report;

he was carrying some $211,772 in his luggage, secreted in six aerosol cans.

This opinion principally addresses Perez's contention that he was denied the effective assistance of counsel because Pagan represented both Perez and Almonte and because Pagan was a potential witness at Perez's trial.

### A. *The First* Curcio *Inquiry*

■ In January 2001, the government wrote to the district court pointing out the similarity between the money smuggling acts of Perez and Almonte, along with Pagan's representation of both defendants, and requested that the court conduct an inquiry of Perez pursuant to *United States v. Curcio,* 680 F.2d 881 (2d Cir.1982) ("*Curcio* hearing"). At such a hearing, the trial court (1) advises the defendant of his right to representation by an attorney who has no conflict of interest, (2) instructs the defendant as to the dangers arising from particular conflicts, (3) permits the defendant to confer with his chosen counsel, (4) encourages the defendant to seek advice from independent counsel, (5) allows a reasonable time for the defendant to make a decision, and (6) determines, preferably by means of questions that are likely to be answered in narrative form, whether the defendant understands the risk of representation by his present counsel and freely chooses to run them. *See id.* at 888–90. The ultimate goal of these procedures is to permit the court to determine whether the defendant's waiver of his right to conflict-free counsel is knowing and intelligent. *See id.* at 888.

In requesting a *Curcio* hearing for Perez, the government stated that "[t]he central question in this case is whether the defendant knew that there was money in the cans in his luggage." (Letter from Special Assistant United States Attorney ("SAUSA") Steven L. D'Alessandro to

Chief Judge Edward R. Korman, dated January 12, 2001, at 3.) The government contended, *inter alia*, that that knowledge could be inferred from the facts that Perez, as Pagan's paralegal, would have had access to facts pertaining to Almonte, Pagan's client; that the two smuggling efforts were strikingly similar; that the cans Perez was carrying were substantially identical to the cans Almonte had carried; and that the two attempts had occurred little more than a week apart. The government stated that it appeared that Pagan was at least a potential witness at trial, as he might have material information as to the knowledge that Perez, while working as his paralegal, had gained as to the details of Almonte's case. The government also noted that, when arrested, Perez was employed by Pagan and said he was traveling on business.

On January 29, 2001, a *Curcio* hearing was begun before Magistrate Judge Steven M. Gold, to whom the matter had been referred for report and recommendation. Those attending the hearing included Perez, Pagan, and a representative of the New York State Association of Criminal Defense Lawyers ("Defense Bar Association").

At that hearing, the government informed the court that it could not be sure whether it would attempt to call Pagan as a witness. (*See* Hearing Transcript, January 29, 2001 ("Jan. 29 Tr."), at 4–5.) The Defense Bar Association representative urged the court not to allow the government to interfere with an accused's right to counsel of his choice, absent some more certain reason to believe there was a conflict of interest. (*See* Jan. 29 Tr. at 7–13.) Pagan stated that he was not aware of any actual or potential conflict of interest resulting from his representation of both Perez and Almonte. (*See* Jan. 29 Tr. at 26.) Pagan also stated that Perez's job as

his paralegal had not entailed any meaningful contact with Almonte:

> Mr. Perez never saw Mr. Almonte's file or complaint, never interviewed Mr. Almonte here or at any jail facility. He's met the family, simply because they were brought to my office to bring me copies of their income taxes and proof of identity and citizenship and things of that nature.

(Jan. 29 Tr. at 17–18.)

The court received assurances from Perez that he spoke and understood English and that he was not laboring under a medical or mental condition that might impair his judgment. The court then proceeded, in accordance with *United States v. Curcio*, to advise and instruct Perez at length as to the dangers of potential conflicts, including the possibility that Pagan might be called as a witness at Perez's trial, and that other conflicts might arise if Almonte chose to cooperate with the government, or if Perez were offered a cooperation agreement that depended on his inculpating Almonte, or if Pagan were targeted by a grand jury investigation. (*See, e.g.,* Tr. at 23–24, 26–36.) The magistrate judge also stated several times that one of the purposes of the hearing was to ensure that, if Perez were convicted, Pagan's simultaneous representation of Perez and Almonte would afford Perez no basis for challenging his conviction. (*See* Jan. 29 Tr. at 3, 20, 21–22.)

Under oath, Perez stated that he understood all that had been said, and he informed the court that he wanted Pagan to continue as his attorney:

> THE DEFENDANT: According to my feelings, I don't see any conflict of interest in this situation. I think we can prove that later. I can prove that. I want Mr. Pagan to continue being my lawyer.

THE COURT: Would you like the opportunity to consult with a lawyer at no cost to you before you make that decision?

THE DEFENDANT: I don't think right now I have any reason to do that.

(Jan. 29 Tr. at 35–36; *see also* Tr. at 37 ("I want him to continue as my lawyer.").) The magistrate judge adjourned the hearing to give Perez additional time for reflection.

The hearing was resumed on the following day. The magistrate judge briefly summarized the potential conflicts of which he had warned Perez in the previous day's proceeding. (*See* Hearing Transcript, January 30, 2001 ("Jan. 30 Tr."), at 5.) In addition, Pagan stated that the issues had been covered with Perez

> very extensively and he's also been told the same by the members of the New York State Association of Criminal Defense Lawyers. So I think in the long run, Mr. Perez has had more attorney attention from the private Bar than the normal defendant would be [*sic*] before this Court.

(Jan. 30 Tr. at 10.) Perez stated that he had thought about the court's advice and instructions, and he rephrased the potential conflicts in his own words. (*See* Jan. 30 Tr. at 5–9.) Perez stated that the issues were clear to him and that he wanted to continue with Pagan as his attorney:

THE COURT: Do you still want to give up your right to have a different lawyer appointed to represent you and continue with Mr. Pagan as your attorney?

THE DEFENDANT: Yes, your Honor.

THE COURT: Do you understand that by doing this, you're giving up your right to challenge your conviction, if it should be obtained—if you're convicted, you will not be able to complain to this Court or the Court of Appeals that your conviction should be set aside because Mr. Pagan had competing interests and

didn't represent you properly as a result.

Do you understand that?

THE DEFENDANT: I understand.

(Jan. 30 Tr. at 9–10.)

As a result of these proceedings, the magistrate judge found Perez's "waiver of the issues that have been raised thus far knowing and voluntary" and recommended that the *Curcio* waiver be accepted and that Pagan continue as Perez's attorney. (Jan. 30 Tr. at 11.)

## B. *The Government's Motion To Disqualify Pagan*

In May 2001, the government moved to disqualify Pagan as counsel for Perez, stating that it planned to call Pagan as one of its witnesses at trial. The government argued that Perez, upon his arrest, had made statements to customs officials from which one could infer that Perez was traveling for Pagan; the government wished to call Pagan as a rebuttal witness to testify that Perez in fact was not traveling for Pagan. The government also argued that by reason of Perez's assistance to Pagan in the representation of Almonte with respect to Almonte's attempt to smuggle reportable currency out of the United States in aerosol cans, Pagan's testimony could help to establish that Perez likely had knowledge that the aerosol cans Perez carried likewise contained reportable currency. The government's motion was referred to Magistrate Judge Gold for report and recommendation.

Perez opposed the motion, contending that he had not told customs officials that he was traveling for Pagan. Pagan argued that his testimony was not needed to establish that Perez worked for him as a paralegal, for that could be stipulated. Pagan also argued that Perez, in that capacity, had had no access to any informa-

tion as to the nature of the charges against Almonte.

The magistrate judge recommended that the government's disqualification motion be granted. He reasoned that Pagan's testimony could help the government's case by describing Perez's contacts with the *Almonte* case; but if the government were able to prove those facts by other means, Pagan might usefully be called as a witness by Perez to counter the government's proof. The magistrate judge thus viewed Pagan as a potential witness for either side.

Perez filed objections to the magistrate judge's recommendation, submitting an affidavit from Perez and argument from Pagan. Perez's affidavit stated, in pertinent part, as follows:

> 2. On September 27th, 2000 I was arrested en route to the Dominican Republic.
>
> 3. I was not traveling on business for Mr. Pagan or on his behalf and I never stated that to any one.
>
> 4. I want Mr. Ramon Pagan to be my lawyer in representing me in this matter.
>
> 5. I will not be able to hire another lawyer and it will create a great financial hardship on me and my family.
>
> 6. To disqualify Mr. Pagan as my attorney is to deny me of [*sic*] my right of counsel of my choice.
>
> 7. I worked briefly for Mr. Pagan. I never examined or had access to Mr. Andres Almonte's file other than as required by the "Curcio" hearings and pleadings therein. I have yet to meet Mr. Andres Almonte.
>
> 8. I am willing to proceed with Mr. Pagan as my attorney.

(Affidavit of Guillermo Aliro Perez, dated July 13, 2001 ("Perez Aff.") ¶¶ 2–8.)

The accompanying memorandum submitted by Pagan stated, *inter alia*, that although Perez had worked for Pagan, and Perez had stated that he was traveling on business when he was arrested, Perez never stated that he was traveling on business for Pagan; and in discovery, the government had produced no evidence that Perez ever stated he was traveling on business for, or on behalf of, Pagan. (Objections to the Granting of Government's Motion to Disqualify Counsel, dated July 13, 2001 ("Objections" or "Perez's Objections to Disqualification"), at 2–3.) Pagan also stated that he had no knowledge of any fact that the government would wish to prove at trial:

> [My] testimony [before the grand jury] revealed neither unique nor material knowledge of the relationship between Mr. Perez and Mr. Almonte, if such a relationship exist [*sic*]. But rather, my testimony revealed that:
>
> 1. Mr. Perez was not in my office when I met with Mr. Almonte's family;
>
> 2. Mr. Perez's only duty with respect to the Almonte case was to pick up documents from Mr. Almonte's family and delivered [*sic*] them to my office;
>
> 3. Mr. Perez did not have access to Mr. Almonte's file prior to his arrest; or since other than as required by the "Curcio" hearings[;]
>
> 4. I did not know that Mr. Perez was leaving the country or when he was returning; and
>
> 5. I was surprise [*sic*] to learn that Mr. Perez was traveling on business when he was arrested.

(Objections at 2–3.) Pagan stated that the fact of Perez's employment by Pagan could be introduced "in the form of a stipulation to avoid my having to testify." (Objections at 4–5.)

After a hearing on Perez's objections to the magistrate judge's recommendation, Chief Judge Korman concluded that the government's motion to disqualify Pagan should be denied. The court found that the government would not need Pagan's testimony to counter the inferred statement by Perez that he was traveling on behalf of Pagan, because Perez had now submitted an affidavit saying that he was not traveling on behalf of Pagan. (*See* Hearing Transcript, July 20, 2001 ("July 20 Tr."), at 5–7, 17.) Further, after being informed that Perez's planned defense was that the bag containing the aerosol cans belonged to someone else, that Perez was doing that person a favor to take the bag to the Dominican Republic, and that Perez had never opened the bag, the court concluded that Pagan's testimony also would not be necessary on any other issue. (*See* July 20 Tr. at 10–12.)

The motion for disqualification was denied. On the government's motion for reconsideration, the district court adhered to that decision. The court concluded that the likelihood that Pagan would provide any testimony that would help the government was insufficient to override Perez's right to counsel of his choice. (*See* Hearing Transcript, September 10, 2001 ("Sept. 10 Tr."), at 17–20.)

C. *The Second* Curcio *Inquiry*

Thereafter, Perez and Pagan participated in a proffer session with the government. During that session, Perez stated that, prior to attempting to board the airplane, he had in fact looked inside the bag he had been given and had seen the aerosol cans. That statement was in direct conflict with Pagan's representation to the court at the July 20 hearing that the defense would be that Perez had never looked inside the bag. In light of Perez's more recent statement, the government wrote to the district court to request a new *Curcio* hearing. The government explained that if Perez testified at trial that he had not looked in the bag and had not seen the cans, the government would attempt to impeach him with the statement he made at the proffer session. The government conceded that it had other witnesses who could testify to Perez's proffer-session statement that he had looked in the bag and that there thus would be no need to call Pagan for that purpose; but the government stated that Perez might wish to rebut the impeaching testimony of those witnesses by calling Pagan as his own witness, which would provoke Pagan's disqualification as trial counsel. The government thus requested a new *Curcio* inquiry

> to explore the potential conflict of interest with the defendant, and then determine whether the defendant would prefer to preserve his right to call Mr. Pagan as a witness at trial (thus necessitating his disqualification) or to forego [*sic*] his ability to call him as a witness at trial (thus retaining him as his trial counsel).

(Letter from SAUSA D'Alessandro to Chief Judge Korman, dated October 19, 2001, at 3.)

In October, a second *Curcio* inquiry was conducted by Magistrate Judge Gold, who explained to Perez that retaining Pagan as his attorney would prevent him from calling Pagan to testify as to what Perez had said—or had not said—at the proffer session. Perez once again stated that he wished to continue with Pagan as his attorney. Following a recess of 1¼ hours to permit Perez to consider the question further, Perez stated that he wished to keep Pagan, to waive the right to call Pagan as a witness, and to waive any right to complain about the outcome of the case on the basis that Pagan was unavailable as a wit-

124

ness. The magistrate judge found Perez's "waiver to be knowing and voluntar[ ]y" and recommended that the case proceed with Pagan as Perez's counsel. (Hearing Transcript, October 26, 2001, at 17.) Pagan remained Perez's attorney through trial.

### D. Perez's Testimony at Trial

At trial, the government presented evidence of the events surrounding Perez's arrest. In his defense, Perez testified that he did not know there was money in his luggage. He testified that the bag containing the aerosol cans of money had been given to him by a man he knew only as "Tony," who asked him to take the bag to the Dominican Republic for Tony's sick mother. Perez stated that he had looked in the bag and had seen aerosol cans; but he did not know there was money in them. On cross-examination, Perez was questioned about the knowledge he had gained of the *Almonte* case in the eight days before his arrest while working as a paralegal for a criminal defense attorney who represented Almonte. Perez testified that he knew Almonte had been arrested for attempting to transport more than $10,000 out of the United States but that he did not know Almonte had carried the money in aerosol cans.

The jury found Perez guilty on both counts of the indictment. He was sentenced as indicated above, and this appeal followed.

## II. DISCUSSION

On appeal, Perez contends principally that Pagan's representation of both Perez and Almonte, and Pagan's potential appearance as a witness at Perez's trial, created conflicts of interest that were unwaivable. He also contends that the admission of evidence referring to the prosecution of Almonte deprived him of a fair trial, that Pagan's performance was constitutionally deficient, and that the court should have imposed a shorter sentence by departing downward from the Sentencing Guidelines. Finding no basis for reversal, we affirm.

### A. The Allegedly Unwaivable Conflicts

Invoking this Court's recent decision in *United States v. Schwarz*, 283 F.3d 76 (2d Cir.2002), Perez contends that his right to effective assistance of counsel was violated because Pagan had conflicts of interest (a) as counsel for both Perez and Almonte, and (b) as a potential witness at Perez's trial, and that those conflicts were not waivable. We reject his contentions. *Schwarz* presented highly "unusual facts," *id.* at 96, that are not easily analogized to other cases—and certainly not to this one—for, as discussed below, *Schwarz* involved a defense attorney's self-interest that actually conflicted with his client's interests so severely as to permeate every aspect of the representation.

#### 1. Multiple Representation and United States v. Schwarz

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. This constitutional guarantee generally ensures that an accused may be represented by any attorney who will agree to take his case. *See, e.g., United States v. Cunningham*, 672 F.2d 1064, 1070 (2d Cir.1982). Although "[a] defendant's right to counsel of his choice is not an absolute one," *United States v. Ostrer*, 597 F.2d 337, 341 (2d Cir.1979), we have consistently recognized that the right of an accused who retains an attorney to be represented by that attorney is " 'a right of constitutional dimension' ", *United States v. Wisniewski*, 478 F.2d 274, 285 (2d

Cir.1973) (quoting *United States v. Sheiner*, 410 F.2d 337, 342 (2d Cir.1969), *cert. denied*, 396 U.S. 825, 90 S.Ct. 68, 24 L.Ed.2d 76 (1969)). Hence the "[c]hoice of counsel should not be unnecessarily obstructed by the court." *United States v. Bernstein*, 533 F.2d 775, 788 (2d Cir.1976); *see also United States v. Bubar*, 567 F.2d 192, 203 (2d Cir.1977) (recognizing a defendant's "constitutional right to be represented by counsel of his own choice"), *cert. denied*, 434 U.S. 872, 98 S.Ct. 217, 54 L.Ed.2d 151 (1977); *United States v. Armedo–Sarmiento*, 524 F.2d 591, 592 (2d Cir.1975) (Sixth Amendment protects criminal defendant's selection of retained counsel).

▮ The right to the effective assistance of counsel also includes the right to be represented by an attorney who is free from conflicts of interest. *See, e.g., Wood v. Georgia*, 450 U.S. 261, 271, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981); *Holloway v. Arkansas*, 435 U.S. 475, 481–82, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978); *Armienti v. United States*, 234 F.3d 820, 823 (2d Cir. 2000); *United States v. Blau*, 159 F.3d 68, 74 (2d Cir.1998). This right may be violated if the attorney has "(1) a potential conflict of interest that result[s] in prejudice to the defendant, or (2) an actual conflict of interest that adversely affect[s] the attorney's performance." *United States v. Levy*, 25 F.3d 146, 152 (2d Cir. 1994). "An attorney has an actual, as opposed to a potential, conflict of interest when, during the course of the representation, the attorney's and defendant's interests diverge with respect to a material factual or legal issue or to a course of action." *United States v. Schwarz*, 283 F.3d at 91 (internal quotation marks omitted); *Winkler v. Keane*, 7 F.3d 304, 307 (2d Cir.1993), *cert. denied*, 511 U.S. 1022, 114 S.Ct. 1407, 128 L.Ed.2d 79 (1994). An attorney has a potential conflict of interest if "the interests of the defendant may place the attorney under inconsistent duties at some time in the future." *United States v. Kliti*, 156 F.3d 150, 153 n. 3 (2d Cir.1998).

▮ Where the right to counsel of choice conflicts with the right to an attorney of undivided loyalty, the choice as to which right is to take precedence must generally be left to the defendant and not be dictated by the government. *See, e.g., United States v. Cunningham*, 672 F.2d at 1073. To ensure that a defendant's choice is knowingly and intelligently exercised, the district court, after learning of the possibility of a conflict of interest, determines whether the attorney has an actual conflict, a potential conflict, or no conflict at all. *See, e.g., United States v. Levy*, 25 F.3d at 153. If the court discovers no genuine conflict, it has no further obligation. *Id.* At the other end of the spectrum, if the court determines that counsel has an actual conflict that is so severe as to indicate *per se* that the rendering of effective assistance will be impeded, or is analogous to such a conflict in "breadth and depth," the court must, as discussed below, disqualify counsel. *See United States v. Fulton*, 5 F.3d 605, 611–13 (2d Cir.1993); *United States v. Schwarz*, 283 F.3d at 95–96. And if, between these two extremes, the court determines that the "attorney suffers from a lesser [actual] or only a potential conflict," then it may accept a defendant's knowing and intelligent waiver of his right to conflict-free counsel and permit the defendant to be represented by the attorney of his choice. *United States v. Levy*, 25 F.3d at 153; *accord United States v. Schwarz*, 283 F.3d at 95. The courts do, of course, retain discretion to reject a defendant's knowing and intelligent waiver when his attorney's conflict jeopardizes the integrity of judicial proceedings. *See, e.g., United States v. Lo-*

*cascio,* 6 F.3d 924, 931 (2d Cir.1993); *United States v. Arrington,* 867 F.2d 122, 129 (2d Cir.1989). But absent such institutional concerns, courts will not "assume too paternalistic an attitude in protecting the defendant from himself," and although the defendant's choice of counsel "may sometimes seem woefully foolish" to the court, the choice remains his. *United States v. Curcio,* 694 F.2d 14, 25 (2d Cir.1982).

Our opinions in *United States v. Fulton* and *United States v. Schwarz* illustrate the very narrow category of cases in which we have held attorney conflicts to be unwaivable. In *Fulton,* a prosecution for conspiracy to possess and import heroin, a government witness had implicated the defendant's trial counsel in related heroin importation. That accusation meant that the attorney needed to be concerned not only with the interests of the defendant but also with the attorney's own "personal reputation, and more than that, the potential that he himself might be accused of a crime," 5 F.3d at 608 (internal quotation marks omitted). As a consequence, we concluded that there was an actual conflict of interest so severe as to amount to *per se* ineffective assistance. The attorney's self-interest in avoiding criminal charges or reputational damage was so powerful as to "affect virtually every aspect of [counsel's] representation of the defendant," and to be of "a different character than other conflicts." *Id.* at 613. "Advice as well as advocacy [would be] permeated by counsel's self-interest, and no rational defendant would knowingly and intelligently be represented by a lawyer whose conduct was guided largely by a desire for self-preservation." *Id.* Given the "breadth and depth" of this conflict, we concluded that there could be no "meaningful waiver." *Id.*

We drew heavily on these principles in finding an unwaivable conflict in *United States v. Schwarz,* although the principal conflict involved the attorney's self-preservation not in terms of his liberty or reputation, as in *Fulton,* but rather in matters of finance. The *Schwarz* case involved the prosecution of several police officers, including Schwarz, in connection with the assaults of Abner Louima *en route* to and inside of a police precinct house. Louima asserted that in the precinct house he had been assaulted by officer Justin Volpe and another officer. Schwarz had an interest in showing either that there was no second assaulting officer or that the second officer was someone other than himself. The attorney representing Schwarz had recently formed a law firm that received a two-year, $10 million retainer to represent the Policeman's Benevolent Association ("PBA"), which was a defendant in a civil suit filed by Louima alleging a cover-up of the events involving the assault on him. In light of the civil suit, it would have been against the interest of the PBA for the jury in the criminal trial to find that there was a second officer, even if he were someone other than Schwarz. Thus, as a substantive matter, the interests of Schwarz and the PBA were divergent.

More importantly, Schwarz's interests diverged from the self-interest of his attorney. Although the attorney and his firm were to have no formal role in the civil suit, the PBA had a right to hold back a portion of counsel's otherwise-quarterly-payable $10 million retainer "to ensure the PBA's satisfaction with the ... firm's performance"; the PBA also had the right to cancel the retainer agreement on 30 days' notice; and the attorney "could expect that satisfaction with the firm's performance would result in a renewal of the retainer upon its expiration." 283 F.3d at 91. Under this arrangement, counsel's powerful interest in his own financial self-preservation gave him a significant incentive to protect the interests of the PBA, even

where they conflicted with the interests of Schwarz.

In sum, counsel's "representation of Schwarz was in conflict not only with his ethical obligation to the PBA as his client, but also with his own substantial self-interest in the two-year, $10 million retainer agreement his newly formed firm had entered into with the PBA." *Id.* at 96. The conflict generated by counsel's self-interest was so severe as to give rise to "the distinct possibility . . . that, at each point the conflict was felt, [counsel] would sacrifice Schwarz's interests for those of the PBA." *Id.* Thus, we concluded that "no rational defendant in Schwarz's position would have knowingly and intelligently desired [that attorney's] representation," and that "*Fulton*'s rationale with respect to when an attorney's self-interest renders a conflict unwaivable" was "equally applicable to the unusual facts" of the *Schwarz* case. *Id.*

 As we made plain in *Fulton*, however, lesser conflicts, such as an attorney's representation of two or more defendants or his prior representation of a trial witness, are generally waivable. *See United States v. Fulton*, 5 F.3d at 613. Although such a conflict might require a defendant to abandon a particular defense or line of questioning, he can be advised as to what he must forgo; he "can then seek the legal advice of independent counsel and make an informed judgment that balances the alteration in the trial strategy against the perceived effect of having to get a new and perhaps less effective defense counsel." *United States v. Fulton*, 5 F.3d at 613. In the multiple representation situation, the defendant "can be advised by independent counsel of the dangers" of such matters as "one defendant's cooperating with the government," and make a knowing and intelligent decision that he wishes to continue to be represented by his attorney despite the attorney's representation of another accused. *Id.* Where the defendant can rationally opt to retain counsel of his choice despite a conflict, the court conducts a *Curcio* hearing to determine whether the defendant knowingly and intelligently waives his right to conflict-free representation. *See, e.g., United States v. Leslie*, 103 F.3d 1093, 1098 (2d Cir.), *cert. denied*, 520 U.S. 1220, 117 S.Ct. 1713, 137 L.Ed.2d 837 (1997); *United States v. Levy*, 25 F.3d at 153.

In the present case, Perez has proffered no facts on which it could be concluded that Pagan had an unwaivable actual conflict of interest based on the representation of both Perez and Almonte. Seeking to analogize his circumstances to the extraordinary actual conflict at issue in *Schwarz*, Perez states that Pagan was "blinded by his own substantial self-interest in that he stood to gain a considerable amount of monies if he remained counsel to both defendants" (Perez brief on appeal at 22). That statement, however, is conclusory and unsupported by any citation to the record, and we have seen nothing whatever to indicate that Pagan had anything approaching the sort of fiscal self-interest that was present in *United States v. Schwarz*. There was nothing to indicate that Pagan had a continuing relationship with, or an exceptionally lucrative retainer from, Almonte. There was also nothing to suggest that the proceedings in the trial of either Perez or Almonte would have repercussions at the trial of the other. Nor was Pagan himself accused of being involved in the money smuggling activities of either Perez or Almonte.

In sum, the conflicts cited by Perez were only potential, not actual, and they involved the rather routine discrete problems that arise when counsel's loyalty is divided among multiple clients. Such conflicts can be knowingly and intelligently

waived, and we see no basis for concluding that the district court erred in not finding that the dual representation here produced a conflict that was unwaivable.

There was the possibility that either Perez or Almonte might be offered a cooperation agreement by the government, with potentially beneficial treatment of the offeree conditioned upon that defendant's inculpation of the other defendant. This posed a potential conflict, but one whose likelihood a defendant could assess and knowingly and intelligently decide to waive. Perez received a full explanation of the potential conflicts from the magistrate judge; he also received advice from members of the Defense Bar Association task force (see Jan. 29 Tr. at 7–13; Jan. 30 Tr. at 10); and he was repeatedly offered—and apparently declined—the opportunity to consult with other independent counsel (see, e.g., Jan. 29 Tr. at 35–36; Jan. 30 Tr. at 6). At each hearing, Perez repeatedly stated that he wanted to retain Pagan as his attorney. The court nonetheless advised Perez that he remained free to contact the court to reopen the question of his representation by Pagan if Perez developed doubts—prior to any judgment of conviction—as to the wisdom of his choice, and Perez indicated that he understood. (See, e.g., Jan. 30 Tr. at 6–7.) Perez never retreated from his election to be represented by Pagan—until after he was convicted.

### 2. *Pagan as a Potential Witness*

■ We also reject the contention that Pagan had an unwaivable conflict of interest because he was a potential witness for the government at trial. The record shows that the government's motion to disqualify Pagan so that he could be called as a government witness was denied several months prior to trial. The government, in its initial letter to the court and in its motion to disqualify Pagan, had stated that it wished to show Perez's employment by Pagan when Pagan represented Almonte, and that it wished to call Pagan as a witness to rebut Perez's (inferred) statement to customs officials on his own arrest that he was traveling on behalf of Pagan. However, it then transpired that the fact that Pagan was Perez's employer was undisputed and was to be stipulated. (See, e.g., Perez's Objections to Disqualification at 4–5; July 20 Tr. at 10.) And the government's need to call Pagan as a witness to testify that Perez was not traveling on behalf of Pagan vanished when Perez submitted his own affidavit to the court stating, "I was not traveling on business for Mr. Pagan or on his behalf and I never stated that to any one." (Perez Aff. ¶ 3.)

On the strength of this affidavit, the district court denied the government's motion to disqualify Pagan, stating that any benefit the government might gain if it were allowed to call Pagan as a witness was outweighed by Perez's interest in retaining Pagan as his counsel of choice. (See July 20 Tr. at 16–18; see also Sept. 10 Tr. at 17–20 (denying government's motion for reconsideration).) Thus, the potential for the government to call Pagan as a witness was eliminated.

Finally, Perez contends that the court was required to disqualify Pagan because, "due to Pagan's dual representation of both defendants, Defendant–Appellant was prevented from pursuing a defense that would have established that he was traveling on business for Mr. Pagan." (Perez brief on appeal at 25.) Leaving aside the lack of any explained connection between the dual representation and the defense Perez now states he wished to pursue, this contention is baseless because it ignores Perez's sworn statement to the district court, that "*I was not* traveling on business for Mr. Pagan or on his behalf" (Per-

ez Aff. ¶ 3 (emphasis added)). Perez made this statement to the district court expressly in order to persuade the court that Pagan should not be disqualified. The court was not required to disqualify Pagan on the premise that Perez might later, despite his sworn representation to the court, decide to change his story.

In sum, the record does not disclose any conflict on the part of Pagan that could not knowingly and intelligently be waived. There is no question that the district court conducted proper *Curcio* hearings, and we see no error in the court's conclusions at each juncture that Perez knowingly and intelligently exercised his right to waive any conflict on the part of Pagan in order to retain counsel of his choice.

B. *Cross–Examination of Perez About the* Almonte *Case*

 Perez also contends that he is entitled to reversal because the district court allowed the government to cross-examine him about his knowledge of the *Almonte* case (a) without requiring the government to "identify a similarity or connection between the two acts that makes the prior act relevant to establishing knowledge of the current act" (Perez brief on appeal at 29), and (b) without weighing the probative value of that evidence against its potential for unfair prejudice until after Perez had testified. We reject both Perez's conclusion and his factual premises.

 The Federal Rules of Evidence allow the admission of evidence of "other crimes, wrongs, or acts" in order to prove, *inter alia,* that the defendant had knowledge of a pertinent fact. Fed.R.Evid. 404(b). If the other act is unconnected to the alleged offense conduct, it must be sufficiently similar to that conduct to permit a rational factfinder to draw the knowledge inference advocated by the proponent of the evidence. *See, e.g., United*

*States v. Peterson,* 808 F.2d 969, 974 (2d Cir.1987); *see generally* 22 Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure: Evidence* § 5245 (1978). "Similarity, being a matter of relevancy, is judged by the degree in which the prior act approaches near identity with the elements of the offense charge[d]. There is no necessity for synonymity but there must be *substantial* relevancy . . . ." *United States v. Kasouris,* 474 F.2d 689, 692 (5th Cir.1973) (emphasis in original).

 In determining whether to allow "similar act" evidence, the trial judge is required to perform a balancing analysis, and he may exclude the evidence, even if it has some relevance to prove knowledge, if its probative value is "substantially outweighed by the danger of unfair prejudice." Fed.R.Evid. 403; *see* Fed.R.Evid. P. 404(b) Advisory Committee Note (1972). The admission of other-act evidence after the trial court has performed the Rule 403 balancing analysis is reviewable only for abuse of discretion. *See, e.g., United States v. Tarricone,* 996 F.2d 1414, 1422 (2d Cir.1993); *United States v. Martino,* 759 F.2d 998, 1005 (2d Cir.1985). We see no abuse of discretion here.

First, there can be no question that the acts of Perez and Almonte were similar. Although the identity of the person carrying the money was different, both travelers had the same destination, they carried similar amounts of money, and in both instances the money was secreted in aerosol cans. Perez's contention that the two sets of acts were not shown to be sufficiently similar is frivolous.

Second, there is no question that the details of the *Almonte* case were introduced to help show that Perez likely had knowledge that the aerosol cans he carried contained reportable currency. Perez had

squarely put his knowledge in issue. He testified that he had been given the bag by "Tony" for Tony's mother, but that he was not given Tony's mother's name, was not given the name or description of the woman to whom he was to deliver the bag, and was not given a contingency telephone number or other means of contacting anyone in the Dominican Republic to arrange for delivery of the bag. Perez stated that, because the situation was "odd" and could get him into trouble (Trial Transcript October 29, 2001 ("Trial Tr."), at 207), he had opened the bag and carefully inspected its contents, noting the presence of the aerosol cans. But he testified that he did not know the cans contained money. Thus, as the government had maintained from the outset, the central issue in the case was Perez's knowledge.

The mere fact that the *Almonte* case involved similar facts, of course, would not have been sufficient to warrant admission of the *Almonte* fact pattern to show knowledge on the part of Perez. But evidence of Perez's exposure to the facts of the *Almonte* case provided a basis from which it could be inferred that Perez knew of Almonte's similar acts. That evidence was that Almonte, upon his arrest, was represented by Pagan; that Perez at that time was employed by Pagan; and that Perez had some role in assisting Pagan on Almonte's case. In light of these facts, it was not error for the trial court to conclude that the combination of Perez's employment role and the similarity between the two cases provided relevant evidence that would permit an inference (a) that Perez had knowledge that there were attempts to smuggle money out of the United States in aerosol cans, and (b) given what he acknowledged were the "odd" circumstances leading to his possession of such cans, that Perez knew the cans he carried contained reportable currency. (*See, e.g.*, Perez brief on appeal at 28 (the

*Almonte*-related evidence "allowed the jury to conclude that Perez had knowledge of how to smuggle these funds, where this knowledge was being wholly denied by Defendant–Appellant.").)

Finally, although Perez also contends that the trial judge did not perform a Rule 403 balancing analysis until after it allowed the government's cross-examination of him on the *Almonte* circumstances, the record does not support this contention. The matter of the evidence as to Perez's involvement with Pagan's handling of the *Almonte* case was discussed extensively by the court at the September 10 status conference, several weeks before trial. That discussion occurred in the context of the court's consideration of the government's request for reconsideration of the denial of its motion to disqualify Pagan in order to call him as a trial witness. The court concluded that there was no information the government could elicit from Pagan that it could not get from Perez on cross-examination; but it repeatedly pondered whether there might be "an element of potentially unfair prejudice" in admitting the testimony. (Sept. 10 Tr. at 13; *see also id.* at 13–19.) The court declined at that conference, however, to make a definitive ruling as to admissibility "in a vacuum." (Sept. 10 Tr. at 19.)

At trial, before the defense presented its case, the court apparently had determined that evidence as to the *Almonte* case would not be allowed except as rebuttal if Perez testified that he had no knowledge that there was money in the aerosol cans. Thus, when the government sought to offer the *Almonte* fact pattern into evidence as part of its case-in-chief, the district court refused to allow it. The court ruled that the government could ask Perez "appropriate" questions about his "work[ ] on a case with identical facts" if Perez took the witness stand. (Trial Tr. at 128–29.)

We see no indication that the trial judge failed to perform the necessary Rule 403 analysis, or misapplied Rule 404(b), or abused his discretion in any way.

### C. *Other Contentions*

Perez also contends that Pagan's performance as his trial counsel was constitutionally defective, and that the trial court should have granted him a downward departure in sentencing. These contentions do not require extended discussion.

The ineffective-assistance-of-counsel claim is without merit. In order to establish such a claim, Perez must show (1) that his counsel's performance fell below an objective standard of reasonableness judged by prevailing professional norms, and (2) that but for the deficiency, there is a reasonable probability that the outcome of the proceeding would have been different. *See Strickland v. Washington*, 466 U.S. 668, 687–88, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Perez has not met either prong of this test.

■■■■ Perez's sentencing contention is not properly before us. In order to be appealable, a district judge's failure to grant a downward departure must be based on an error of law or a misapprehension by the judge of his power to depart. *See, e.g., United States v. Acevedo*, 229 F.3d 350, 356 (2d Cir.2000), *cert. denied*, 531 U.S. 1027, 121 S.Ct. 602, 148 L.Ed.2d 514 (2000). Although Perez argues that the district judge here may have mistakenly believed he had no authority to depart, we see no support for this contention. The record as a whole plainly shows that the court was refusing to depart as an exercise of its discretion, and the sentence fragment on which Perez relies is entirely unpersuasive in light of the fact that the judge's statement was interrupted by Perez's attorney. We conclude that the refusal to depart is unreviewable.

## CONCLUSION

We have considered all of Perez's contentions that are properly before us and have found them to be without merit. The judgment of the district court is affirmed.

RAGGI, Circuit Judge, concurring in the judgment.

I join in the Court's affirmance of Perez's conviction and write separately only on his claim of an unwaivable attorney conflict of interest.

To the extent Perez relies on *United States v. Schwarz*, 283 F.3d 76 (2d Cir. 2002), to support this claim, I agree with my colleagues that the circumstances of this case are not at all analogous to the "highly 'unusual facts'" that prompted a finding of unwaivable conflict in *Schwarz*. [*See ante* at 124] (quoting *United States v. Schwarz*, 283 F.3d at 96). I similarly agree that the category of cases where conflicts are unwaivable is "very narrow" indeed. [*See ante* at 126]. Where I depart from my colleagues is in their reiteration of the "no rational defendant" standard that the Court has sometimes employed as a means of identifying this narrow category of unwaivable conflicts. [*See ante* at 126, 127].

Preliminarily, I note that after surveying the applicable Supreme Court and Second Circuit precedents, the Court does today draw a distinction between waivable and unwaivable conflicts that may assist district courts when contemplating what often seem like "no-win" conflict decisions. Specifically, the Court clarifies that only "actual" conflicts are unwaivable and, even then, only if they are so severe as to (a) indicate *per se* ineffective assistance of counsel or, (b) be analogous to *per se* ineffectiveness in the conflict's "breadth and depth." [*See ante* at 126] (quoting

*United States v. Fulton*, 5 F.3d 605, 613 (2d Cir.1993)). On the other hand, if an attorney suffers from a "lesser [actual] or only a potential conflict," the conflict is waivable, provided the defendant's choice is knowingly and intelligently made. [*See ante* at 126] (quoting *United States v. Levy*, 25 F.3d 146, 153 (2d Cir.1994)); *cf. United States v. Locascio*, 6 F.3d 924, 931 (2d Cir.1993) (recognizing courts' discretion to reject knowing and intelligent waiver when attorney conflict infects the integrity of judicial proceedings); *United States v. Arrington*, 867 F.2d 122, 129 (2d Cir. 1989) (same). In this much of the Court's analysis, I am prepared to join. My concern is with the Court's further reference to whether a conflict is one that "no rational defendant" would waive.

It appears that the Court first referenced "no rational defendant" in the context of an unwaivable conflict in 1993 in *United States v. Fulton*, 5 F.3d at 613. There, however, its purpose was to emphasize that no defendant could waive an attorney conflict so severe as to equate to *per se* ineffective assistance of counsel.

> The danger arising from representation by a counsel who has been implicated in related criminal activity by a government witness is of a different order of magnitude, however. Advice as well as advocacy is permeated by counsel's self-interest, and no rational defendant would knowingly and intelligently be represented by a lawyer whose conduct was guided largely by a desire for self-preservation.

*Id.* By the following year, the "no rational defendant" reference had assumed a more definitional role in identifying unwaivable conflicts: "If the court discovers that the attorney suffers from a severe conflict—such that no rational defendant would knowingly and intelligently desire the con-

flicted lawyer's representation—the court is obliged to disqualify the attorney." *United States v. Levy*, 25 F.3d at 153. In *Levy*, the Court did not expand on what it meant by "no rational defendant," perhaps because its focus was not on the rationality of the defendant or his choice, but on his failure to receive the information necessary to execute a knowing and intelligent waiver of his attorney's myriad conflicts. *Id.* at 155–59. After *Levy*, reference to the "no rational defendant" standard became routine in cases involving any conflict of interest challenge. *See Ciak v. United States*, 59 F.3d 296, 305 n. 5 (2d Cir.1995) (reversing for failure to inquire into attorney conflict); *United States v. Lussier*, 71 F.3d 456, 462 (2d Cir.1995) (rejecting defendant's claim that his conflict waiver was not knowing and intelligent); *United States v. Malpiedi*, 62 F.3d 465, 468 n. 2 (2d Cir.1995) (reversing conviction where defendant did not waive attorney conflict that resulted in lapse of representation); *United States v. Kliti*, 156 F.3d 150, 153 (2d Cir.1998) (reversing conviction where court failed to inquire if defendant was willing to waive attorney conflict).

More recently, the "no rational defendant" standard was invoked by the Court in *United States v. Schwarz*, to explain that "the conflict between [counsel's] representation of Schwarz, on the one hand, and his ethical obligation to the PBA as his client and his self interest in the PBA retainer, on the other, was so severe that no rational defendant in Schwarz's position would have knowingly and intelligently desired [the attorney's] representation." 283 F.3d at 96. But as the facts in *Schwarz* revealed, the defendant—at least at one time—had desired, indeed, had insisted on, the representation of his conflicted attorney. Moreover, in *Schwarz*, unlike in *Levy, Ciak, Malpiedi*, and *Kliti*, the defendant made this choice after a flawless *Curcio* inquiry, highlighted by his

own impressive recitation of the nature of his attorney's conflict. *Id.* at 83.

After *Schwarz*, then, district courts might well wonder what it means to conclude that "no rational defendant" would choose to be represented by a lawyer with a particular conflict, especially when the defendant standing before them is adamantly and cogently asserting that that is precisely his choice. They would find little assistance by looking to the common meaning of the word "rational." A person is usually considered "rational" if he is in possession of his reason and competent to use it. *See* Webster's Third New International Dictionary 1885 (1993). I do not, however, understand the Court in *Schwarz* to have been questioning the defendant's mental competency, whether with respect to his choice of representation or any other aspect of his defense. Neither could the Court have rejected the defendant's conflict waiver simply because it viewed the choice as "woefully foolish," for when the issue is whether and how an accused is to be represented by counsel, courts will not "assume too paternalistic an attitude in protecting the defendant from himself." [*See ante* at 126] (quoting *United States v. Curcio*, 694 F.2d 14, 25 (2d Cir.1982)).

In sum, because I am not quite certain what we mean by our reference to "no rational defendant" in identifying unwaivable conflicts, I would not continue to use this standard. To my mind, a conflict is not unwaivable because no rational defendant would proceed under such circumstances. Rather, a conflict is unwaivable because it presents such extraordinary circumstances that even a rational defendant cannot be permitted to offer a knowing and intelligent waiver. If I am correct, we should focus on identifying those narrow circumstances as precisely as possible. To continue to refer to conflicts that "no ra-

tional defendant" would waive is more confusing than elucidating.