UNITED STATES of America, Appellee,

v.

Roger LUSSIER, Defendant–Appellant.

No. 94–1377.

United States Court of Appeals, Second Circuit.

Argued May 11, 1995.

Decided Aug. 18, 1995.

---

F. Lee Bailey, Bailey, Fishman & Leonard, Boston, MA (Kenneth J. Fishman, Peter Charles Horstmann, of counsel), for defendant-appellant.

Paul J. Van De Graaf, Asst. U.S. Atty., D. Vermont, Burlington, VT, (David V. Kirby, Acting U.S. Atty., James J. Gelber, Asst. U.S. Atty., of counsel), for appellee.

Before: NEWMAN, McLAUGHLIN and PARKER, Circuit Judges.

McLAUGHLIN, Circuit Judge:

Roger Lussier, President and Chairman of the Board of Lyndonville Savings Bank, was charged in a twenty-count indictment with bank fraud, false bank entries, receipt and payment of illegal commissions, money laundering, and making false statements to federal bank examiners. After a jury trial in the United States District Court for the District of Vermont (Franklin S. Billings, Jr., *Judge* ), Lussier was convicted on seventeen of the twenty counts. The trial court sentenced him to forty-six months' imprisonment on all counts for which he was convicted, with the exception of one count for which he received a twelve month sentence. All sentences are to run concurrently, but were stayed pending appeal.

Lussier raises numerous issues on this appeal. We write only to address whether Lussier was denied effective assistance of counsel based on his attorney's alleged conflict of interest. We have fully considered the other claims advanced on this appeal, and find them to be without merit.

## BACKGROUND

We discuss only those facts relevant to whether Lussier was denied effective assistance of counsel.

*The Colonnade Deal*

Independent Bankgroup, Inc. ("IBG") owned several Vermont banks. Lussier was President and Chairman of the Board of one of the banks, the Lyndonville Savings Bank ("LSB"). During a federal investigation of several of the IBG banks, including LSB, the government uncovered a pattern of criminal conduct, whereby Lussier and others used the IBG banks to fund certain illegal transactions. One of these transactions involved a scheme by Lussier to arrange for LSB loans to purchase and re-sell the Colonnade Restaurant, located in Lyndonville, Vermont (the "Colonnade deal"). The deal was allegedly executed by a three-man partnership, comprising of Lussier, who acted behind the scenes, William Hill, who was the front man, and Arthur Elliot, another member of the LSB board of directors.

The seeds of the Colonnade deal were sown in early 1988, when David Archambeau purchased the Colonnade Restaurant from Ashley Gray for $500,000. Archambeau financed the deal with a $375,000 first mortgage from LSB, and a $100,000 second mortgage from Gray.

Later that year, Archambeau closed the restaurant as a money loser. To avoid foreclosure, Archambeau and Gray agreed to sell the restaurant at an auction conducted by Lussier, who owned an auction firm. The agreement stated that if the auction produced more than $375,000, Gray would forgive the second mortgage in return for a split of the proceeds above $375,000 with Archambeau. If the auction brought less than $375,000, however, Gray would not forgive the second mortgage. Lussier and Elliot signed this agreement as witnesses.

The restaurant went on the auction block with Lussier as the auctioneer. The land and the building were sold to Hill, the highest bidder, for $295,000. On its face, Hill appeared to be the sole purchaser of the property; but, in fact, he purchased the property in partnership with Elliot. Unbeknownst even to Hill, Lussier was a silent partner with Elliot. The sale enabled Archambeau to pay off LSB's first mortgage.

Hill funded the entire purchase price through a $350,000 loan from LSB. At the LSB board of directors meeting where Hill's loan was approved, Lussier and Elliot urged approval and did not abstain, the usual practice when voting on a loan that involved members of the board.

At about the same time that LSB approved the loan to Hill, Elliot negotiated to sell the restaurant for $475,000 to David Fox, a businessman from New Hampshire. Fox put up no money of his own, but, rather, funded the purchase price through a $375,000 loan from another one of the IBG banks and a $100,000 personal loan from Elliot and another individual, Gerald Farrington. (Elliot and Farrington, however, obtained the $100,000 through a loan from LSB.) By this time, Hill knew that Lussier was a partner in the deal. The sale to Fox enabled Hill to repay his $350,000 loan to LSB, leaving a profit of almost $90,000. That profit was split equally among the partners: one-third going to Hill, and two-thirds going to Elliot, who, in turn, paid half of that amount to Lussier.

*Representation by Peter Langrock*

Hill subsequently pled guilty to bank fraud involving an unrelated loan from one of the IBG banks, and he agreed to cooperate fully with the government. During the plea negotiations, Hill was represented by Peter Langrock, a Vermont attorney. After pleading guilty and testifying before the grand jury, Hill gave the government his file on the Colonnade deal.

At the same time, Langrock was also representing Lussier, who was charged in a twenty-count indictment with: (1) four counts of bank fraud, in violation of 18 U.S.C. §§ 2, 1344; (2) three counts of making false entries, in violation of 18 U.S.C. §§ 2, 1005; (3) four counts of accepting commissions for procuring loans, in violation of 18 U.S.C. §§ 2, 215; (4) four counts of money laundering, in violation of 18 U.S.C. §§ 2, 982, 1957; and (5) five counts of making false statements, in violation of 18 U.S.C. § 1001. The government, sensing a conflict of interest,

filed a pretrial motion for a hearing to resolve Langrock's potential conflict. The government noted that Hill was likely to be called as a government witness at Lussier's trial.

At the hearing, Hill was represented by new counsel, David Gibson, and Lussier was represented by Langrock. The government's principal concerns were two-fold: first, that Langrock's prior representation of Hill would prevent Langrock from inquiring into privileged matters on cross-examination, unless Hill waived the attorney/client privilege; and second, that Lussier should make a knowing, voluntary and intelligent waiver of any potential conflict.

*Hill*

The court first queried Langrock and Gibson about the potential conflict. It then questioned Hill, himself, about waiving the attorney/client privilege arising from his prior representation by Langrock:

> THE COURT: Very well. Mr. Hill, as you probably heard, that Mr. Langrock now represents Mr. Lussier, although he did represent you. As I understand it, it's a possibility that you may be called as a witness in the *United States v. Lussier* case. And if that is true, of course, Mr. Langrock, unless—would not be able to cross examine you on any conversations that he had between you and Mr. Langrock unless you would waive, voluntarily, your attorney/client privilege. Do you understand what I'm saying?
>
> MR. HILL: Yes, I believe I do. And I have no problem with that, your Honor.
>
> THE COURT: In other words, that you would waive any privilege that you might have in connection with the conversations that you had with Mr. Langrock when he was representing you.
>
> MR. HILL: I have no problem with that, your Honor.
>
> THE COURT: Very well. And Mr. Gibson's explained, as I gather, fully the potential conflicts and your rights in this matter?
>
> MR. HILL: Yes, I believe so.
>
> THE COURT: Is that right?
>
> MR. HILL: I believe so, yes.

> THE COURT: And as I understand it, you have—you would waive any privilege, and also you understand that you may well be cross-examined by Mr. Langrock—
>
> MR. HILL: Yes.
>
> THE COURT:—If you were called as a witness—
>
> MR. HILL: Yes, I do.
>
> THE COURT:—with respect to these matters?
>
> MR. HILL: Yes, I do.
>
> THE COURT: And you have no objection to that?
>
> MR. HILL: No, I do not.

*Lussier*

The court then addressed Lussier about the potential conflicts of interest posed by Langrock's prior representation of Hill:

> THE COURT: Mr. Lussier, as you probably know, you have the right, obviously, to effective counsel and counsel that does not have any conflicts of interest. I would like to know, first, has Mr. Langrock explained to you the possible potential conflict of interest that might exist?
>
> THE DEFENDANT: Yes. I'm more than ready to take the chance.
>
> THE COURT: And do I understand that you would, knowing the potential conflicts, that he represented Mr. Hill previous to this time, that you would waive any conflicts that you might have so that you could have effective counsel?
>
> THE DEFENDANT: Yes.
>
> THE COURT: And Mr. Langrock has fully explained the fact that, as I understand it, he did represent Mr. Hill—
>
> THE DEFENDANT: Yes, he did.
>
> THE COURT: And knowing that, you still have no objection—
>
> THE DEFENDANT: I have no objection.
>
> THE COURT:—to Mr. Langrock continuing to represent you?
>
> THE DEFENDANT: I want him to represent me.
>
> THE COURT: Very well. Thank you.

The court concluded, based upon Hill's waiver of the attorney/client privilege and Lussier's waiver of the potential conflict, that "there [was] no conflict of interest to require Mr. Langrock to be disqualified."

Langrock represented Lussier at trial. Lussier was convicted on seventeen of the twenty counts charged in the indictment. As already noted, the trial court sentenced him to a total of forty-six months' imprisonment. Represented by new counsel, Lussier now appeals. He argues that he was denied effective assistance of counsel at trial, because (1) the district court abused its discretion by allowing him to waive the conflict, and (2) the waiver itself was defective because it was not made knowingly, voluntarily, and intelligently.

## DISCUSSION

### I. *Attorney Conflict of Interest*

■ Although a defendant may generally waive his Sixth Amendment right to a non-conflicted attorney, "the essential aim of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Wheat v. United States,* 486 U.S. 153, 159, 108 S.Ct. 1692, 1697, 100 L.Ed.2d 140 (1988); *see United States v. Fulton,* 5 F.3d 605, 612 (2d Cir.1993). Thus, when "the specter of conflicts of interest arises," the district court (1) must establish whether the attorney, in fact, labors under an actual or a potential conflict, and, if so, (2) must then ensure that the conflict is either eliminated or waived. *United States v. Levy,* 25 F.3d 146, 152–53 (2d Cir.1994); *United States v. Malpiedi,* 62 F.3d 465, 468 n. 2 (2d Cir.1995); *see Holloway v. Arkansas,* 435 U.S. 475, 484, 98 S.Ct. 1173, 1179, 55 L.Ed.2d 426 (1978).

### A. *Inquiry Obligation*

■ When a district court learns of even the possibility of a conflict of interest, it must inquire into the details of the attorney's interests to determine whether the conflict is actual, potential, or nonexistent. *Levy,* 25 F.3d at 153; *Strouse v. Leonardo,* 928 F.2d 548, 555 (2d Cir.1991). Failure to fulfill this obligation constitutes *per se* reversible error. *Levy,* 25 F.3d at 153–54.

■ Here, the court clearly met this initial inquiry obligation. After the government notified the court of the potential conflict presented by Langrock's earlier representation of Hill, the court conducted a pretrial hearing to explore the issue. At the hearing, the government highlighted the problems that could arise from Langrock's prior representation of Hill. Langrock then assured the court that he had already discussed those potential conflicts with Lussier and that Lussier, nonetheless, wanted Langrock to continue to represent him.

David Gibson, Hill's new attorney, assured the court that he too had discussed the potential conflicts with Hill, and that Hill was willing to waive the attorney/client privilege with respect to his prior communications with Langrock. Thus, the court, fulfilling its initial inquiry obligation, established at least that a possible conflict existed. *See id.* at 154 (holding that district court met initial inquiry obligation by obtaining representations from counsel concerning possible conflict of interest).

### B. *Disqualification/Waiver Obligation*

■ With a possible conflict established, the district court then had the more demanding task of determining whether the conflict could be resolved by a waiver, or whether Langrock had to be disqualified. If a conflict is so egregious that no rational defendant would knowingly and voluntarily desire the attorney's representation, then the court must disqualify the attorney. *Id.* at 153. If, however, the court determines that the conflict is not severe or that there is only the possibility of a conflict, then the court must follow the procedures set out in *United States v. Curcio,* 680 F.2d 881, 888–90 (2d Cir.1982), to secure a knowing, voluntary, and intelligent waiver from the defendant of his right to a non-conflicted attorney. *Levy,* 25 F.3d at 153.

Here, there were two possible areas of conflict: first, that Langrock's prior representation of Hill would prevent Langrock

from inquiring into privileged matters on cross-examination of Hill; and second, that any unpaid legal fees could place Hill and Langrock in a debtor/creditor relationship, thus undermining Langrock's whole-hearted allegiance to Lussier.

■ When a defense attorney cross-examines a former client who is a witness against the defendant, a conflict of interest may exist; absent a waiver from the former client, the attorney cannot inquire into privileged matters. *See United States v. Iorizzo,* 786 F.2d 52, 57–58 (2d Cir.1986); *Ciak v. United States,* 59 F.3d 296, 304–05 (2d Cir.1995); *Malpiedi,* 62 F.3d at 470. Here, however, after discussing the potential conflicts with Gibson, Hill unambiguously waived his attorney/client privilege with respect to his prior communications with Langrock. Thus, the court correctly concluded that the primary area of conflict—Langrock's potential inability to cross-examine Hill fully at trial—was significantly diminished by this waiver. *See, e.g., Curcio,* 680 F.2d at 885 (suggesting that waiver of privilege by one defendant so that his attorney could use confidential information to defend his co-defendant diminished the conflict).

■ Of course, a conflict may also arise when an attorney cross-examines a former client who owes him a fee. Here, Langrock stated that he had arranged with Hill to be paid for work he had performed, with downward adjustments for any work duplicated by Gibson. There is no evidence that these representations were untrue, that the fees remained unpaid, or that the fee arrangements between Hill and Langrock interfered with Langrock's effectiveness at trial. Thus, we find that the conflicts were at worst potential, *i.e.,* creating merely the possibility of some unforeseen problem arising at trial because Langrock had previously represented Hill. Accordingly, the district court did not abuse its discretion in determining that a valid waiver could be effected.

■ Because there existed only a potential for a non-severe conflict, a valid waiver could be made. *See Levy,* 25 F.3d at 153, 155. To secure a valid waiver, the court must: (1) advise the defendant about potential conflicts; (2) determine whether the defendant understands the risks of those conflicts; and (3) give the defendant time to digest and contemplate the risks, with the aid of independent counsel if desired. *Curcio,* 680 F.2d at 888–90; *see Iorizzo,* 786 F.2d at 59; *United States v. Jenkins,* 943 F.2d 167, 176 (2d Cir.), *cert. denied,* 502 U.S. 1014, 112 S.Ct. 659, 116 L.Ed.2d 751 (1991). When "considering if a defendant's waiver was adequate, [however,] we are more concerned with whether the defendant appreciated his predicament and made a properly informed choice than we are with whether the trial judge recited any particular litany of questions." *Jenkins,* 943 F.2d at 176; *see Curcio,* 680 F.2d at 888 ("If the defendant reveals that he is aware of and understands the various risks and pitfalls, and that he has the rational capacity to make a decision on the basis of this information, and if he states clearly and unequivocally that he nevertheless chooses to hazard those dangers, we would regard his waiver as knowing and intelligent. . . .") (citation omitted).

■ We find that the court sufficiently complied with the *Curcio* procedures. First, Lussier was apprised of the potential conflicts. The government's motion for a pretrial hearing detailed the possible conflicts posed by Langrock's prior representation of Hill, and Lussier's response, filed by Langrock, further addressed those concerns. Lussier was present at the hearing when the parties discussed the conflicts in open court. Langrock stated, and Lussier confirmed, that they had fully discussed the extent of the potential conflicts. Although Lussier's responses to the court's inquiries were not couched in the preferred narrative form, he unequivocally stated that he was "more than ready to take the chance" that Langrock might be burdened by a potential conflict. *See Curcio,* 680 F.2d at 889 (noting that although questions designed to elicit a narrative response are preferable to questions designed to elicit "yes" or "no" answers, "'[m]ere assent in response to a series of questions from the bench *may in some circumstances* constitute an adequate waiver'")

(emphasis added) (quoting *United States v. Garcia*, 517 F.2d 272, 278 (5th Cir.1975)).

We dismiss Lussier's argument that his attainment of only an eighth grade education demonstrates his lack of sophistication and ability to understand the extent of the conflict. We find it untenable that Lussier could achieve the position of President and Chairman of the Board of a savings and loan institution, as well as orchestrate and participate in numerous schemes to defraud the bank and the government, and yet not have the acumen to understand the risks involved with his attorney's potential conflict, about which there was ample disclosure. *See Faretta v. California*, 422 U.S. 806, 835, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975) (holding that defendant with high school education was "literate, competent, and understanding, and ... voluntarily exercising his informed free will," and should have been allowed to forgo counsel altogether); *Curcio*, 680 F.2d at 888–89 (suggesting that the question whether a waiver is knowing and voluntary should be determined by whether the defendant is informed and has the capacity for making a rational decision, not based on the defendant's formal education level). Not only did Lussier understand what he was doing, but his actions were apparently driven by his desire to provide himself with competent trial counsel of his own choosing.

We are somewhat troubled by the court's failure to inform Lussier that he was entitled to independent counsel to advise on waiver. Nevertheless, Lussier, an experienced businessman who plainly understood the nature of the conflict, had ample time to contemplate the risks. Over two weeks passed between the filing of the motion papers for a hearing on the conflict and the hearing itself. Lussier was present at the hearing where the government reiterated its concerns, Langrock and Gibson gave full responses, and Hill waived the attorney/client privilege. Thus, although the court perhaps could have done more, under the circumstances of this case, we find that the procedures followed by the trial court were sufficient to obtain a knowing, intelligent, and voluntary waiver under *Curcio*.

## II. *Prejudice*

Even if the waiver were somehow flawed, Lussier, nonetheless, received effective assistance of counsel. When a court fails to obtain from the defendant an adequate waiver of the conflict, the defendant still has not suffered ineffective assistance of counsel unless his attorney has either (1) a potential conflict of interest that resulted in prejudice to the defendant; or (2) an actual conflict of interest that adversely affected the attorney's performance. *Levy*, 25 F.3d at 152 (citations omitted). An attorney labors under an actual, as opposed to a potential, conflict "when, during the course of the representation, the attorney's and defendant's interests 'diverge with respect to a material factual or legal issue or to a course of action.'" *Winkler v. Keane*, 7 F.3d 304, 307 (2d Cir.1993) (quoting *Cuyler v. Sullivan*, 446 U.S. 335, at 356 n. 3, 100 S.Ct. 1708, at 1714 n. 3, 64 L.Ed.2d 333 (1980)), *cert. denied,* —— U.S. ——, 114 S.Ct. 1407, 128 L.Ed.2d 79 (1994); *Malpiedi*, 62 F.3d at 469 (citations omitted).

Here, we find that, at most, Langrock labored under a potential conflict. At the pretrial hearing, the district court properly established that the primary areas of concern were the attorney/client privilege and the fee arrangements arising from Langrock's prior representation of Hill. As previously discussed, Hill's waiver of the privilege and the discussions between the court and counsel regarding the fee arrangements significantly diminished these concerns. Langrock was free to cross-examine Hill on any matter—including confidential communications—and there was no evidence of unpaid fees at the time of trial. Thus, there was no material divergence between Lussier's and Langrock's interests.

Because the conflict was merely potential, the government had the lesser burden of demonstrating that Lussier was not prejudiced by Langrock's alleged failure to cross-examine Hill effectively. *See United States v. Edwardo–Franco*, 885 F.2d 1002, 1007 (2d Cir.1989). We find that the government has met that burden.

Lussier faults Langrock for not formally introducing Hill's written plea agreement

into evidence. This contention need not detain us long. The government fully questioned Hill about the details of the agreement. This put the jurors on notice of any potential bias on Hill's behalf. The actual plea agreement itself would have added little, if anything, to this colloquy.

Lussier also faults Langrock for not eliciting from Hill the exact time when Lussier entered the partnership—arguing that the government's case depended upon Lussier's being a partner at the time of the auction. In the government's direct examination of Hill, however, Hill categorically stated that he and Elliot were partners at the time of the auction. He added that he knew Lussier was a partner at the time the restaurant was re-sold to Fox, but did not recall when Lussier actually joined the partnership.

Thus, contrary to Lussier's assertion, Hill's testimony is *consistent* with the defense's theory that Lussier was not a partner at the time of the initial auction. Hill's testimony also comports with the government's theory that Lussier was a hidden partner at the time of the auction and that Hill was merely unaware of Lussier's interest at that time. Because Hill's testimony supported the theories of both parties, the jury was free to draw its own conclusions as to that testimony's significance and meaning.

We therefore conclude that, even if the waiver were somehow flawed, Lussier suffered no prejudice from Langrock's purportedly deficient cross-examination of Hill.

Lussier raises numerous other issues on this appeal. We have fully considered each of these claims, and find them to be without merit.

### CONCLUSION

Because Lussier knowingly and voluntarily waived his attorney's potential conflict of interest, he was not denied effective assistance of counsel. Accordingly, the judgment of conviction and sentence is

AFFIRMED.