17-4092-cr
United States v. Arrington

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term, 2018

(Argued: May 29, 2019    Decided: October 18, 2019)

Docket No. 17-4092-cr

————————————————————

UNITED STATES OF AMERICA,

*Appellee,*

v.

RODERICK ARRINGTON,

*Defendant-Appellant.*[*]

————————————————————

Before:

LYNCH and LOHIER, *Circuit Judges*, and COGAN, *District Judge*.[**]

Roderick Arrington appeals from a judgment of conviction entered after a jury trial in the United States District Court for the Western District of New York (Arcara, *J.*).  We conclude that the trial evidence was sufficient to support each count of conviction, including Arrington's convictions for murder and attempted murder in aid of racketeering under 18 U.S.C. § 1959.  We also conclude, however, that Arrington's Sixth Amendment right to effective assistance of counsel was violated when the District Court failed to ensure that Arrington understood the full scope of the consequences arising

---

[*] The Clerk of Court is directed to amend the official caption to conform with the above.

[**] Judge Brian M. Cogan of the United States District Court for the Eastern District of New York, sitting by designation.

from his counsel's conflict of interest, including the disadvantages of a trial severance that counsel proposed. We therefore **VACATE** Arrington's conviction and **REMAND** to the District Court for a new trial.

ANDREW LEVCHUK, Amherst, MA, *for Defendant-Appellant* Roderick Arrington.

WEI XIANG, Assistant United States Attorney (Mary C. Baumgarten, Assistant United States Attorney, *on the brief*), *for* James P. Kennedy, Jr., United States Attorney for the Western District of New York, Buffalo, NY, *for Appellee* United States of America.

LOHIER, *Circuit Judge*:

Roderick Arrington appeals from a judgment of conviction entered after a jury trial in the United States District Court for the Western District of New York (Arcara, J.). We conclude that the trial evidence was sufficient to support each count of conviction, including Arrington's convictions for murder and attempted murder in aid of racketeering under 18 U.S.C. § 1959. We also conclude, however, that Arrington's Sixth Amendment right to effective assistance of counsel was violated when the District Court failed to ensure that Arrington understood the full scope of the consequences arising from his counsel's conflict of interest, including the disadvantages of a trial severance that counsel proposed. We therefore vacate Arrington's conviction and remand to the District Court for a new trial.

2

## BACKGROUND

Because this is an appeal from a judgment of conviction entered after a jury trial and Arrington challenges the sufficiency of the evidence against him, the following facts are drawn from the trial evidence and described in the light most favorable to the Government.  See United States v. Caltabiano, 871 F.3d 210, 218 (2d Cir. 2017).

A. The "Schuele Boys" and Arrington's Role

This case centers on the drug trafficking of a violent gang operating principally in a neighborhood on the east side of the City of Buffalo.  The Government refers to the members of the gang as "the Schuele Boys," after Schuele Avenue, a street in the neighborhood.  Gov't App'x 66–67.  The Schuele Boys—including Arrington, his co-defendants Aaron Hicks, Marcel Worthy, and LeTorrance Travis, and witnesses Jerome Grant and Demario James—grew up together in the neighborhood.

Arrington's trial focused largely on the group's drug trafficking starting around 2010.  Some Schuele Boys members arranged to transport kilograms of cocaine and marijuana to Buffalo through "traps" in vehicles or through shipped parcels.  Hicks, Travis, and Worthy were responsible for distributing

3

the cocaine and marijuana when it arrived in Buffalo. Another Schuele Boys member and co-defendant, Julio Contreras, invested some of the drug proceeds in G.O.N.E. Entertainment, a record label incorporated by Hicks that promoted Schuele Boys associate Sandy Jones. Two music videos produced by G.O.N.E. starred Jones, included scenes with Arrington, Hicks, Travis, Worthy, and other Schuele Boys members, and contained lyrics that referenced drug trafficking, drug proceeds, guns, and violence committed to protect the drug business.

Arrington appears to have been only peripherally involved in the group's core drug distribution activities. For example, Arrington was present when Grant and others broke down a forty-pound bale of marijuana for sale. Grant also testified that Arrington sold him marijuana in 2001 and cocaine in 2013. And in 2014 the police executed a warrant to search Arrington's mother's house, where Arrington had been staying, and found heroin, drug paraphernalia, and a loaded handgun.

But violence played an important part in protecting the Schuele Boys and their territory for drug dealing in the neighborhood, and it is Arrington's role as an "enforcer" that is a central focus of our sufficiency review. At trial,

4

the Government repeatedly described Arrington as an "enforcer" or as "muscle" for the Schuele Boys. See, e.g., Gov't App'x 102–03, 108, 1077, 1086, 1091–92, 1102. Grant testified that Arrington once expressed his frustration with wearing an ankle monitor because he wanted to "tak[e] hits," which Grant understood to mean that Arrington wanted to kill on behalf of others. Gov't App'x 531, 533. Arrington also offered to kill people for Grant. And James testified that Arrington offered, for a discounted price reserved for close friends or relatives, to "take care of" someone who had robbed James. Gov't App'x 636.

    B. <u>The Murder of Quincy Balance and Attempted Murder of Damon Hunter</u>

    Arrington's role as an "enforcer" for the Schuele Boys was on full display in August 2012. On August 26, 2012, Schuele Boys member and drug dealer Walter "Matt" Davison—Hicks's best friend—was shot and killed. In the immediate aftermath of Davison's murder, Arrington and other Schuele Boys members talked about two individuals that they believed were involved

in Davison's killing. Arrington was armed with guns at that gathering. Later, at Davison's wake, the same group vowed to kill whoever had killed Davison.

Four days after Davison's death, on August 30, 2012, Quincy Balance and Damon Hunter approached Hicks in the Schuele neighborhood to convince Hicks that they were not responsible for Davison's death, as Hunter had been previously warned that "someone was after" Hunter and Balance for killing Davison. Gov't App'x 977. Moments after Balance started talking with Hicks, Arrington emerged from "the other side of the street." Id. at 988. Balance approached Arrington, apparently intending to explain that he had not killed Davison. Arrington then pulled out a pistol and shot Balance dead. Hunter heard the shots and yelled at Arrington that he had nothing to do with Davison's death. Hunter then dropped to the ground unharmed, rolled under a truck, and began running away as shots flew past him.

Arrington was later arrested at this mother's house on October 31, 2014. After his arrest and detention for murder, Arrington made a number of incriminating statements and engaged in some conduct evincing consciousness of guilt. For example, in early 2015, Arrington repeatedly asked Grant whether he had spoken with law enforcement. Additionally,

6

Arrington told Grant, with apparent relief, that Hunter had given his assurance that he was not cooperating against Arrington about "shooting" Balance. Gov't App'x 500, 504–08. Arrington also wrote a note to a friend pressuring him not to cooperate and directing the friend to tear up the note after reading it.

C. Procedural History

On June 19, 2015, the Government filed a superseding indictment against Arrington, Hicks, Worthy, Travis, and Contreras. Arrington was charged with twelve counts: racketeering conspiracy in violation of 18 U.S.C. § 1962(d); narcotics conspiracy in violation of 21 U.S.C. § 846; possession of a firearm in furtherance of a crime of violence and drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i); murder in aid of racketeering activity in violation of 18 U.S.C. § 1959(a)(1); two counts of discharge of a firearm in furtherance of a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(iii); discharge of a firearm in furtherance of a crime of violence, resulting in murder, in violation of 18 U.S.C. § 924(j)(1); attempted murder in aid of racketeering activity in violation of 18 U.S.C. § 1959(a)(5); possession of heroin with intent to distribute in violation of 21 U.S.C. § 841(a)(1); maintaining

7

drug-involved premises in violation of 21 U.S.C. § 856(a)(1); possession of a firearm in furtherance of drug trafficking crimes in violation of 18 U.S.C. § 924(c)(1)(A)(i); and possession of a firearm and ammunition by a convicted felon in violation of 18 U.S.C. § 922(g)(1).

1. Pretrial Proceedings

On April 22, 2016, Arrington's trial attorney, Andrew LoTempio, disclosed to the District Court his ongoing representation in a separate but related case of Michael Robertson, who had been mentioned in certain discovery documents. A magistrate judge (Scott, M.J.) held a hearing in accordance with United States v. Curcio, 680 F.2d 881 (2d Cir. 1982), to determine whether or not a conflict of interest existed, and appointed independent Curcio counsel for Arrington. After conferring with Arrington, Curcio counsel recommended that Magistrate Judge Scott not find a conflict of interest with respect to LoTempio's representation of Robertson. The Magistrate Judge then granted LoTempio's motion to withdraw his representation of Robertson and accepted Arrington's in-court waiver of a potential conflict related to LoTempio's representation of Robertson. At the hearing, LoTempio disclosed that he previously also represented Hicks "in

8

unrelated criminal matters." Dist. Ct. Dkt. No. 92. We see no record of any further discussion of LoTempio's prior representation of Hicks that day.

On September 14, 2016, Arrington, represented by LoTempio, moved to sever his trial from that of his co-defendants, and, on October 11, 2016, requested an immediate trial. In his severance motion, Arrington, relying primarily on Bruton v. United States, 391 U.S. 123 (1968), said that his co-defendants' post-arrest statements and confessions might implicate him. That motion was denied. Almost a year later, on August 28 and August 31, 2017, respectively, Travis and Contreras pled guilty, leaving Arrington, Hicks, and Worthy set to proceed to trial on September 11, 2017.

On September 3, 2017, roughly one week before trial, Hicks filed a motion urging the District Court to find that LoTempio had an actual conflict of interest stemming from his prior representation of Hicks in a state court matter referenced as an overt act in the superseding indictment. The overt act, which the Government alleged was committed in furtherance of the racketeering enterprise, related to Hicks's retrieval of a box containing thirty-three pounds of marijuana in 2014. Hicks's trial attorney, Robert Ross Fogg,

9

asserted that LoTempio's conflict of interest was unwaivable and, in any event, that Hicks refused to waive it.

### 2. The *Curcio* Hearing

On September 5 and 6, the District Court (Arcara, J.) held a *Curcio* hearing to address the conflict arising from LoTempio's prior representation of Hicks. Arrington was in the courtroom at the start of the hearing on the first day, as were LoTempio, Fogg, and Hicks. The District Court informed Arrington that he had "a very strong interest in having Mr. LoTempio cross-examine all the witnesses against [him] aggressively to try to challenge the believability or the credibility or the reliability of the witnesses." Joint App'x 260. Because LoTempio also owed a duty to Hicks, the District Court explained, LoTempio could not use information he had learned while representing Hicks, and therefore "might not be able to represent [Arrington] as zealously as he should by aggressively cross-examining witnesses of events that happen[ed] in 2014," Joint App'x 261, and might "have to pull some punches . . . because of his loyalty to . . . Hicks," Joint App'x 262–63. LoTempio confirmed that he could not use any information from Hicks's earlier case to cross-examine Hicks. Joint App'x 263–64. In response to these

10

warnings, Arrington repeatedly said that he understood the nature of the conflict. The District Court then apprised Arrington of his right to a conflict-free lawyer, assigned independent Curcio counsel to advise Arrington, instructed Arrington that he could discuss whether or not to waive the conflict with both Curcio counsel and LoTempio, and gave Arrington ample time to decide. Arrington and his Curcio counsel then left the courtroom to discuss the issues in another room.

Unfortunately, the District Court continued to discuss the nature of the conflict with LoTempio and Fogg while Arrington was outside the courtroom. Fogg argued that LoTempio should be disqualified because Hicks would be less likely to testify in his own defense if LoTempio, his former lawyer, could cross-examine him. LoTempio responded that "it would put me in an awful predicament if [Hicks] took the stand and it would probably be more of a severance issue than me being removed." Joint App'x 268. This was the first time anyone mentioned severing the trials of Arrington and Hicks as a solution to LoTempio's conflict of interest. In response, the District Court suggested that severance might make "the issue go[] away." Joint App'x 272.

11

The next day, September 6, the District Court finished its <u>Curcio</u> colloquy with Arrington and, based on <u>Curcio</u> counsel's representations, accepted Arrington's waiver of the conflict and adjourned. Later that day, the District Court held a separate proceeding to deal with Hicks's motion to disqualify LoTempio. Although LoTempio was present virtually throughout, the record suggests that Arrington was not even in the courtroom and did not otherwise participate in this proceeding.[1] In any event, the District Court never addressed Arrington about LoTempio's request for a severance (or anything else) during the proceeding even though it significantly affected Arrington.

The proceeding started with Fogg again arguing that Hicks would be less likely to testify because of LoTempio's conflict, that the conflict was not waivable, and that disqualifying LoTempio was the only appropriate remedy. Severance, Fogg added, was not in his client's best interest.

Because it framed the District Court's decision to sever the trials, we quote LoTempio's response at length:

---

[1] It is helpful for appellate review for the minute entry on the docket (or for the transcript of proceedings) to indicate that a criminal defendant is present in the courtroom.

Now, I don't know [what Hicks will say]. If he [inculpates Arrington], then I owe a duty to Mr. Arrington to go after Mr. Hicks and impeach him and cross-examine him with everything I have at my abilities. And you know, it would be hard for me to separate what I know from . . . what Mr. Hicks may or may not have told me when I represented him during the overt act in this.

So, the Canons of Ethics basically start with the idea that I can't represent either one of them. And then it goes on to say that, depending on how related the matters are, increases the prohibition. And here, they're definitely related to one another. The two cases, they're inextricably interwoven. They're part and parcel of the charges.

And then the question then becomes, can [Arrington] consent? And it talks about cases where he can't even consent because the temptation of a lawyer serving both people is so grave that there shouldn't even be consent. So, I think, at this point—I don't know that it's appropriate to kick me off the case. I think that the appropriate remedy, at this point, would be to grant a severance.

And then, only if Mr. Hicks cooperates with the government in a separate trial against Mr. Arrington would this issue come up again. If he doesn't cooperate, then he's removed from . . . Mr. Arrington's case, and I never have to cross-examine him and I'm never tempted to use information that he gave to me and it becomes a moot point. If he does cooperate, then we're kind of kicking the can down the road, but you're still giving – at least giving Mr. Arrington an opportunity to keep the attorney of his choice.

So, I think that this case would come back on appeal if we don't at least do a severance. I guess that's my opinion, for what it's worth. And I'm asking that you do that, because otherwise, I'm being put in a predicament

13

where I am going to almost have to choose between Mr. Arrington and my duty to—that's still left over to my former client, which is to not talk about things or confront him with things that I may or may not remember. I'm being put in an awful position.

. . . .

So, at this late stage, I think that the—I would like to represent Mr. Arrington and continue to do that. And I think the only way that that can happen, without me violating my former client's rights, is if we're given a separate trial. And I don't care if I go first. I'm ready to try the case. I'll go first, if you want. Doesn't matter to me.

Joint App'x 302–05.

LoTempio's proposal did not go over well with the other parties. Fogg continued to strongly oppose severance, while the Government disputed that severance would resolve the conflict because Arrington could still call Hicks as a witness in his own case. But the District Court was concerned about delaying trial, and it ultimately agreed to sever the trials and to immediately try Arrington and Worthy.

### 3. Arrington's Trial and the Jury Verdict

Trial started on September 11, 2017. Worthy pled guilty on the first morning of jury selection, leaving Arrington to be tried alone. During trial, it

14

became abundantly clear that Arrington killed Balance and tried to shoot Hunter. For example, Worthy confirmed that Arrington shot Balance and tried to shoot Hunter. Another witness, Ja'Quan Johnson, testified that Arrington shot Balance, and that in the days leading up to the shooting, Arrington asked people in the neighborhood about Balance's whereabouts.

Arrington's defense at trial focused on the Government's limited evidence that Arrington participated in the Schuele Boys' drug dealing or acted as their "enforcer." Arrington consequently argued that because no conspiracy or racketeering enterprise existed under federal law, any murder charges against him should have instead proceeded in state court.

The trial lasted nine days. During the first full day of jury deliberations, one juror alerted the District Court that he knew one of the victims of a shooting mentioned at trial and said that his personal knowledge might impair his ability to deliberate. The District Court denied Arrington's motion for a mistrial, replaced the juror with an alternate, and instructed the

jury to "start all over again" and "disregard your earlier deliberations." Gov't App'x 1243–44, 1248–49, 1254.

A few hours later, the reconstituted jury convicted Arrington on Counts 1 through 8: racketeering conspiracy (Count 1), narcotics conspiracy (Count 2), possession of firearms in furtherance of a crime of violence or drug trafficking crime (Count 3), murder in aid of racketeering activity (Count 4), two counts of discharge of a firearm in furtherance of crimes of violence (Counts 5 and 8), discharge of a firearm causing death in furtherance of a crime of violence (Count 6), and attempted murder in aid of racketeering activity (Count 7). The jury acquitted Arrington of the four remaining drug or gun possession charges.

### 4. Hicks's Trial and Retrial

Hicks's trial took place shortly after Arrington's. Testifying in his own defense, Hicks denied the existence of the Schuele Boys enterprise, denied knowing why Balance was killed, and claimed that he did not see Arrington at the scene of Balance's murder. Hicks confirmed that Balance and Hunter

16

told him that they did not kill Davison; but Hicks also testified that Balance told him that Hunter was responsible.

A jury convicted Hicks of narcotics conspiracy, acquitted him of possession of a firearm in furtherance of a crime of violence or drug trafficking offense, and deadlocked on the racketeering conspiracy charge. The Government retried Hicks on the racketeering conspiracy charge, and the second jury convicted him. Hicks did not testify at his second trial.

5. Arrington's Post-Trial Motions and Sentencing

Arrington filed a motion for acquittal under Federal Rule of Criminal Procedure 29, arguing principally that the evidence was insufficient to establish an enterprise, Arrington's membership in the enterprise, his role in a drug conspiracy, or that Arrington killed Balance in furtherance of any enterprise. The District Court denied the motion, concluding that the evidence showed that Arrington knew of the conspiracy's core racketeering activity and knowingly joined the conspiracy. Joint App'x 669–79. The District Court also found that the evidence established that the Schuele Boys were an association-in-fact enterprise in which Arrington held a position. The District Court pointed to the "overwhelming evidence" that Arrington

17

murdered Balance and attempted to murder Hunter and determined that a reasonable jury could conclude that Arrington did so to maintain or promote his position in the enterprise. Joint App'x 675.[2] This appeal followed.

**DISCUSSION**

On appeal, Arrington makes three main arguments.

First, he challenges the sufficiency of the evidence supporting each count of conviction.[3] We conclude that the evidence, viewed in the light most favorable to the Government, was sufficient to support each count of conviction.

Second, Arrington argues that his Sixth Amendment right to conflict-free counsel was violated when the District Court failed to disqualify his trial counsel, or, alternatively, that the District Court failed to conduct a waiver colloquy that adequately informed Arrington of the nature of the conflict.

---

[2] The District Court did, however, vacate one of Arrington's discharge convictions (Count 5) as the lesser-included offense of another (Count 6).

[3] Although we vacate Arrington's conviction on other grounds discussed below, we address his sufficiency challenges because we would be required to direct the District Court to enter a judgment of acquittal if there were insufficient evidence to support conviction, instead of vacating the conviction and remanding for a new trial. United States v. Rosemond, 841 F.3d 95, 113 (2d Cir. 2016).

18

Because we agree that Arrington's waiver was not knowing and intelligent, we vacate Arrington's conviction and remand for a new trial.

We therefore need not, and do not, reach Arrington's third argument that the District Court abused its discretion in replacing a juror for good cause and refusing to grant a mistrial.

A. Sufficiency of the Evidence

We review sufficiency challenges de novo, considering the evidence in its totality. United States v. Persico, 645 F.3d 85, 104 (2d Cir. 2011). We defer to the jury's choice between competing inferences reasonably drawn from the evidence. Id. In a criminal case, we will uphold the conviction if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979).

1. Racketeering Conspiracy

The conspiracy provision of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(d), "proscribes an agreement to conduct or to participate in the conduct of [an] enterprise's affairs through a pattern of racketeering activity." United States v. Pizzonia, 577 F.3d 455, 462

(2d Cir. 2009). To prove a RICO conspiracy, the Government need not establish the existence of an enterprise, United States v. Applins, 637 F.3d 59, 75 (2d Cir. 2011), or that the defendant committed any predicate act, United States v. Yannotti, 541 F.3d 112, 129 (2d Cir. 2008). It need only prove that the defendant knew of, and agreed to, the general criminal objective of a jointly undertaken scheme. Applins, 637 F.3d at 75; see United States v. Zichettello, 208 F.3d 72, 99–100 (2d Cir. 2000).

Here, a reasonable jury could find beyond a reasonable doubt that Arrington agreed with other members of the Schuele Boys to function as a unit for the common purpose of selling drugs. First, evidence at trial established that, while his personal participation was limited, Arrington knew that his associates were involved in the drug trafficking business. We note especially the evidence that Arrington offered James, a Schuele Boys member, a "family price" to retaliate against a robber who stole marijuana belonging to James. Gov't App'x 636. We also note Arrington's participation in the G.O.N.E. music videos. Second, based on the evidence we have already described, a reasonable jury could find beyond a reasonable doubt that Arrington murdered Balance and shot at Hunter in retaliation for Davison's

20

murder and to protect the Schuele Boys' drug trafficking business, although the connection between the murder and the business itself is a close call. See Yannotti, 541 F.3d at 122.

### 2. Narcotics Conspiracy

For largely the same reasons that the evidence was sufficient to support Arrington's conviction for RICO conspiracy, the evidence was also sufficient to support his conviction for narcotics conspiracy. Arrington concedes the existence of a drug conspiracy involving Hicks, Travis, Worthy, and others. He simply denies that he joined the conspiracy. But a reasonable jury could have found that Arrington's role and offers to serve as "muscle" assisted his co-conspirators' drug trafficking activities. See United States v. Hawkins, 547 F.3d 66, 71 (2d Cir. 2008).

### 3. Murder and Attempted Murder in Aid of Racketeering

To convict Arrington for committing a violent crime in aid of racketeering under 18 U.S.C. § 1959, the Government had to establish that: (1) a racketeering enterprise existed; (2) the enterprise's activities affected interstate commerce; (3) Arrington had a position in the enterprise; (4) Arrington committed a violent crime; and (5) Arrington committed the

21

violent crime, as relevant here, "for the purpose of . . . maintaining or increasing position in [the] enterprise." Id. § 1959(a); United States v. Concepcion, 983 F.2d 369, 380–81 (2d Cir. 1992). On appeal, Arrington challenges the sufficiency of the evidence supporting the first, third, and fifth elements. We address each of Arrington's challenges in turn.

### a. The Existence of a Racketeering Enterprise

"[A]n association-in-fact enterprise is simply a continuing unit that functions with a common purpose." Boyle v. United States, 556 U.S. 938, 948 (2009); see also United States v. Pierce, 785 F.3d 832, 838–39 (2d Cir. 2015). As we explained above with respect to Arrington's conviction for racketeering conspiracy, a reasonable jury could conclude from evidence of the relationship between Hicks, Travis, Worthy, Contreras, and others, and from their actions over a period of years, that the Schuele Boys were "a continuing unit that function[ed] with [the] common purpose" of selling drugs in and around their neighborhood on the east side of Buffalo. Boyle, 556 U.S. at 948.

We therefore reject Arrington's sufficiency challenge to the first element of his conviction for committing a violent crime in aid of racketeering activity.

### b. Arrington's Position in a Racketeering Enterprise

Despite Arrington's limited participation in the enterprise's core drug trafficking activity, for many of the same reasons that we conclude there was sufficient evidence of Arrington's agreement to participate in the RICO conspiracy, we are also of the view that the evidence at trial was sufficient to allow a reasonable jury to conclude that Arrington held a position within the Schuele Boys enterprise. While Arrington's position was, to be sure, a low and peripheral one, any position is enough. See United States v. Brady, 26 F.3d 282, 290 (2d Cir. 1994). Arrington served as an enforcer for the Schuele Boys, able and willing to hurt people who crossed its members. Arrington's role in the G.O.N.E. music videos and his activities while in jail also evidenced his membership in the Schuele Boys.

### c. The Motive Requirement

As relevant here, § 1959 required the Government to prove that Arrington committed a crime of violence at least in part "for the purpose of . . . maintaining or increasing [his] position in" the Schuele Boys enterprise.

23

18 U.S.C. § 1959(a); see United States v. Pimentel, 346 F.3d 285, 295–96 (2d Cir. 2003); United States v. Thai, 29 F.3d 785, 817 (2d Cir. 1994).  This motive requirement is "satisfied if 'the jury could properly infer that [Arrington] committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership.'"  Thai, 29 F.3d at 817 (quoting Concepcion, 983 F.2d at 381).

Arrington argues that there was insufficient evidence for the jury to conclude that he killed Balance or tried to kill Hunter for the purpose of maintaining or promoting his position within the Schuele Boys group. Arrington does not dispute that Balance and Hunter were targeted to avenge Davison's death and barely disputes the strong evidence that he shot them. See, e.g., Gov't App'x 1128; Appellant's Br. 35–36.[4]  The real question for us, then, is whether there was evidence from which a reasonable jury could conclude that Arrington committed either act in furtherance of, or as an

---

[4] As the District Court recognized, the evidence of Arrington's personal involvement in the murder was overwhelming.  Three eyewitnesses identified Arrington as the shooter.  See Gov't App'x 562–75, 933–34, 989–92.

integral aspect of, his role as an enforcer for the Schuele Boys. Although it is a close call, the answer is yes.

At trial, some witnesses testified about the use of violence to protect the Schuele Boys' drug business. A few witnesses described Arrington's offers to serve as an enforcer for members of the Schuele Boys and to kill people on their behalf either for free or at a discounted "family" price. And in the run-up to Balance's murder, Arrington, armed, talked with Hicks, Worthy, and others about killing whoever had killed Davison.

What gives us some pause about the evidence of Arrington's motivation is that he appears to have been a peripheral member of the Schuele Boys. And his work for the group could suggest a financial or personal motivation as much as it does an effort to protect the group's reputation or members. Urging that conclusion, Arrington points to our decisions in Thai and United States v. Bruno, 383 F.3d 65 (2d Cir. 2004), in which we vacated convictions under § 1959.

Both cases are distinguishable. In Thai, the evidence showed that the defendant committed murder for "purely mercenary" reasons (money), rather than to protect his criminal organization or maintain his position within it. 29

25

F.3d at 818; accord United States v. Ferguson, 246 F.3d 129, 135–36 (2d Cir. 2001) (defendant was an outside hitman who did not belong to the gang). And in Bruno, the defendant was motivated entirely by money and a personal vendetta to commit a violent crime that served only to decrease his position within the Genovese crime family. 383 F.3d at 84–85. Here, in contrast to both Thai and Bruno, there is no evidence that Arrington was paid to avenge Davison's murder. Nor is there evidence, as the Government observes, that Arrington harbored a motive for the shootings unrelated to his attachment to the Schuele Boys. To the contrary, in this case, as in United States v. Burden, while "[p]ersonal beefs also may have been satisfied . . . the evidence supported a finding" that Arrington "engaged in violent acts because it was expected of [him] as . . . [a] member[] of the [enterprise]." 600 F.3d 204, 221 (2d Cir. 2010).

In arriving at this conclusion, we rely on the evidence that some Schuele Boys members believed that Davison, a fellow member, was killed during a drug robbery committed by Balance and Hunter. Such a robbery would have posed a direct threat to the Schuele Boys. We are also persuaded by evidence that Arrington's plan to murder Balance and Hunter was hatched

with other Schuele Boys members, not alone. At Davison's wake, for example, Arrington talked with Schuele Boys members specifically about killing Balance and Hunter. For these reasons, the jury properly could have inferred that Arrington sought to avenge Davison's murder on behalf of the Schuele Boys and thereby confirm his position as an enforcer in the group—in other words, that the shootings were not merely "an act of personal revenge" but also "tied to [Arrington's] racketeering activities." United States v. James, 239 F.3d 120, 124 n.5 (2d Cir. 2000).

### 4. Firearms Counts

In addition to challenging the racketeering and narcotics conspiracy charges against him, Arrington attacks his convictions on the firearms-related charges (Counts 3, 5, 6, and 8) on the ground that the evidence was insufficient to support the predicate crimes of violence or drug trafficking (Counts 1, 2, 4, and 7). Because we reject those sufficiency arguments above,

we also reject Arrington's sufficiency challenge with respect to his firearms convictions.

B. The Conflict of Interest in Representation

Although there was sufficient evidence to support Arrington's counts of conviction, we agree with Arrington that his waiver of LoTempio's conflict of interest was not knowing and intelligent. We therefore vacate Arrington's conviction.

1. Legal Background

The Sixth Amendment right to effective assistance of counsel "generally ensures that an accused may be represented by any attorney who will agree to take his case." United States v. Perez, 325 F.3d 115, 124 (2d Cir. 2003). A defendant has a "'correlative right to representation that is free from conflicts of interest.'" Cardoza v. Rock, 731 F.3d 169, 183 (2d Cir. 2013) (quoting Wood v. Georgia, 450 U.S. 261, 271 (1981)).

When a defendant's right to choose the counsel he wants "conflicts with the right to an attorney of undivided loyalty, the choice as to which right is to take precedence must generally be left to the defendant." Perez, 325 F.3d at 125. But district courts have an "independent duty to ensure that criminal

28

defendants receive a trial that is fair and does not contravene the Sixth Amendment." Wheat v. United States, 486 U.S. 153, 161 (1988). For that reason, "[w]hen a district court is sufficiently apprised of even the possibility of a conflict of interest"—as the District Court was here—it has a threshold obligation to "investigate the facts and details of the attorney's interests to determine whether the attorney in fact suffers from an actual conflict, a potential conflict, or no genuine conflict at all." United States v. Levy, 25 F.3d 146, 153 (2d Cir. 1994); see Perez, 325 F.3d at 125.

An attorney has an actual conflict "when, during the course of the representation, the attorney's and defendant's interests diverge with respect to a material factual or legal issue or to a course of action." United States v. Schwarz, 283 F.3d 76, 91 (2d Cir. 2002) (quotation marks omitted). The attorney suffers from only a potential conflict when the "interests of the defendant may place the attorney under inconsistent duties at some time in the future." Perez, 325 F.3d at 125 (quotation marks omitted).

If the district court concludes that defense counsel has a genuine conflict, it has to determine whether the conflict is so severe as to require the attorney's disqualification or whether it is a lesser conflict that can be waived

29

in a <u>Curcio</u> hearing. <u>Levy</u>, 25 F.3d at 153. In most cases where a defendant's attorney has a conflict, the defendant "may make a knowing and intelligent waiver of his right to a conflict-free lawyer if he desires to continue the representation." <u>United States v. Cain</u>, 671 F.3d 271, 293 (2d Cir. 2012). In rare cases, an attorney's conflict is unwaivable because it is so serious that "no rational defendant . . . would have knowingly and intelligently desired" the conflicted attorney's representation, <u>Perez</u>, 325 F.3d at 127; <u>see Cain</u>, 671 F.3d at 293; <u>Schwarz</u>, 283 F.3d at 95–97; <u>United States v. Fulton</u>, 5 F.3d 605, 613 (2d Cir. 1993), or because, as we have also phrased it, the conflict is "so severe as to indicate <u>per se</u> that the rendering of effective assistance will be impeded," <u>Perez</u>, 325 F.3d at 125. We have identified such "<u>per se</u> violation[s] of the Sixth Amendment" where the "defendant's counsel was unlicensed, and when the attorney has engaged in the defendant's crimes." <u>Fulton</u>, 5 F.3d at 611.

Where an attorney suffers from a waivable actual or potential conflict, the district court must conduct a <u>Curcio</u> hearing to determine whether the defendant will knowingly and intelligently waive his right to conflict-free representation. <u>Curcio</u>, 680 F.2d at 881-91; <u>Levy</u>, 25 F.3d at 153. To ensure

30

that a defendant's waiver is made knowingly and intelligently at the Curcio

hearing, the district court should: "(i) advise the defendant of the dangers

arising from the particular conflict; (ii) determine through questions that are

likely to be answered in narrative form whether the defendant understands

those risks and freely chooses to run them; and (iii) give the defendant time to

digest and contemplate the risks after encouraging him or her to seek advice

from independent counsel." United States v. Iorizzo, 786 F.2d 52, 59 (2d Cir.

1986). In evaluating a district court's fidelity to Curcio's guidance, "we are

more concerned with whether the defendant appreciated his predicament and

made a properly informed choice than we are with whether the trial judge

recited any particular litany of questions." United States v. Jenkins, 943 F.2d

167, 176 (2d Cir. 1991). We also recognize that a district court must decide

whether to allow a waiver of a conflict of interest "not with the wisdom of

hindsight after the trial has taken place, but in the murkier pre-trial context,"

when the "likelihood and dimensions of nascent conflicts of interest are

notoriously hard to predict." Wheat, 486 U.S. at 162.

On appeal, a defendant challenging his conviction on the ground that

he was deprived of his Sixth Amendment right to effective assistance of

31

counsel as the result of a conflict must demonstrate, first, that the conflict was either unwaivable or that his waiver was not knowing and intelligent, see Schwarz, 283 F.3d at 95, and second, that he was prejudiced by the conflict, see Levy, 25 F.3d at 152, in other words, that "but for counsel's unprofessional errors, the result of the proceeding would have been different," Fulton, 5 F.3d at 609 (quotation marks omitted). As for the second requirement, where the conflict is potential we require that the defendant establish prejudice. Where an actual conflict exists, however, we presume prejudice and require only that the defendant show that "a lapse in representation . . . resulted from the conflict." Iorizzo, 786 F.2d at 58 (quotation marks omitted). A lapse in representation means that some "plausible alternative defense strategy or tactic might have been pursued, and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." Levy, 25 F.3d at 157 (quotation marks omitted).

### 2. Counsel's Conflict

Arrington argues that LoTempio's conflict was not waivable. If that were right, then the District Court would have abused its discretion in denying Hicks's motion to disqualify LoTempio. See Schwarz, 283 F.3d at 95. But we conclude that the two conflicts that arose from LoTempio's prior representation of Arrington's co-defendant were both waivable.

The first conflict arose from LoTempio's duty to Hicks, his former client, which compromised his ability to be a zealous advocate for Arrington. LoTempio had represented Hicks with respect to one of the overt acts in the indictment, and he was therefore barred from using the fruits of that representation to benefit Arrington or from fully cross-examining witnesses about related events. The effects of this conflict would have been magnified had Hicks testified in his own defense at a joint trial. See, e.g., United States v. Kliti, 156 F.3d 150, 154–55 (2d Cir. 1998); United States v. Leslie, 103 F.3d 1093, 1098 (2d Cir. 1997); United States v. Lussier, 71 F.3d 456, 462 (2d Cir. 1995); United States v. Malpiedi, 62 F.3d 465, 470 (2d Cir. 1995).

Although LoTempio's conflict compromised his ability to be a zealous advocate for Arrington, it was nonetheless waivable. See Perez 325 F.3d at

33

127–29; Iorizzo, 786 F.2d at 59; see also Lussier, 71 F.3d at 462. For one thing, we have generally found that this type of conflict is waivable. See United States v. Oberoi, 331 F.3d 44, 50 (2d Cir. 2003). For another thing, this first conflict stemming from LoTempio's prior representation was potential, not actual; at the time the District Court severed the trials, it was not clear that Hicks would testify or what he would say if he did. See Lussier, 71 F.3d at 462; see also Joint App'x 302.

The second, more serious conflict arose from Hicks's refusal to waive LoTempio's conflict, LoTempio's insistence on severing the trials, and LoTempio's offer to have Arrington tried first. Recall that Hicks was concerned that LoTempio would draw from his prior representation of Hicks when cross-examining Hicks if he testified. This put LoTempio in what he aptly called an "awful predicament." Joint App'x 268. It could be reasonably inferred that LoTempio suggested a severance (something he had raised on different grounds about a year earlier and had not since revisited) in response to the "predicament" presented by Hicks's disqualification motion. See Joint App'x 268, 303–04. During the Curcio hearing, LoTempio stated: "I would like to represent Mr. Arrington and continue to do that. And I think the only

34

way that that can happen, without me violating my former client's rights, is if we're given a separate trial. And I don't care if I go first. I'm ready to try the case. I'll go first, if you want. Doesn't matter to me." Joint App'x 304–05. By proposing that Arrington be tried first, LoTempio surrendered the significant strategic advantage of learning the Government's evidence with respect to Hicks in advance of or during Arrington's trial. At that point, because LoTempio's interest and Arrington's interest "diverge[d] with respect to a . . . course of action," LoTempio's conflict was actual, not potential. Schwarz, 283 F.3d at 91 (quotation marks omitted).

But even though this second conflict was actual, it was also waivable. See Perez, 325 F.3d at 125; compare Fulton, 5 F.3d at 612–13 (witness implicated defendant's attorney in drug deal, which created a conflict that "so permeate[d] the defense that no meaningful waiver can be obtained"). Three reasons in particular compel this view. First, Arrington had no discernible right to proceed to trial with or after Hicks. See Zafiro v. United States, 506 U.S. 534, 539–40 (1993). Second, LoTempio's conflict primarily implicated his ethical obligation to Hicks, and while he had a financial interest in continuing to represent Arrington, that interest was not of sufficient magnitude to

35

establish an unawaivable conflict. See Perez, 325 F.3d at 126–27 (finding

attorney's interest in standard retainer fee did not create unwaivable conflict

as it did not approach the exceptional financial self-interest presented in

Schwarz); cf. Schwarz, 283 F.3d at 98; Fulton, 5 F.3d at 613 (attorney conflict

driven by counsel's interest in "self-preservation").

And third, while there may be tactical advantages to being tried second

if a severance is granted, they are not necessarily so compelling as to create an

unwaivable conflict. A reasonable defendant may decide to retain a trusted

attorney, even at the risk of losing those advantages, after being properly

informed of the risks and benefits of severance. We therefore cannot say

under the circumstances that "no rational defendant would knowingly and

intelligently desire the conflicted lawyer's representation." Levy, 25 F.3d at

153.

### 3. The Inadequacy of the Waiver Colloquy

Although LoTempio's conflict was waivable, Arrington's waiver here

was neither knowing nor intelligent. Before a defendant can waive his

attorney's conflict, he must be advised of the conflict's significant strategic

consequences. Here, the District Court failed to advise Arrington at all about

36

the main strategic disadvantages arising from LoTempio's conflict noted above.

To be sure, on the first day of the Curcio hearing, with Arrington present, the District Court described Arrington's interest in having LoTempio vigorously cross-examine Hicks should he testify and told Arrington how LoTempio's conflict might affect his interests. The District Court then arranged for Arrington to meet with independent Curcio counsel and gave Arrington a day to consider what he wanted to do.

But Arrington was not told about the severance or that he would be tried first until after the District Court ordered it. He was absent when Hicks's counsel moved to disqualify LoTempio and the initial discussion about severing the trials occurred. Nor, it appears, was Arrington in court when LoTempio offered to proceed with Arrington's trial first, even though the proposal put Arrington at a strategic disadvantage. The District Court thus never directly addressed Arrington regarding these consequences of his counsel's conflict, and we have no record of LoTempio independently discussing them with Arrington. In other words, Arrington was not given reasonably adequate information about the material risks of LoTempio's

37

continued representation, particularly the risks of a trial severance and the risk of being required (let alone volunteered) to be tried first.

As for the inquiry the District Court should have conducted, as noted "we are more concerned with whether the defendant appreciated his predicament and made a properly informed choice than we are with whether the trial judge recited any particular litany of questions." Jenkins, 943 F.2d at 176. But district courts must at least "advise the defendant of the dangers arising from the particular conflict." Iorizzo, 786 F.2d at 59. Where, as here, those "dangers" include giving up the strategic advantages of a joint trial or being tried before a co-defendant, they should be a part of the judge's inquiry to obtain the defendant's informed consent. See RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 122 cmt. c(i) (AM. LAW INST. 2000) (Informed consent "requires that each affected client be aware of the material respects in which the representation could have adverse effects on the interests of that client," including "tactical considerations . . . that would be foreclosed or made less readily available by the conflict"). Where a counsel's conflict of interest materially affects a significant tactical or strategic consideration, a

court should advise the defendant of the nature of that risk as part of a <u>Curcio</u> inquiry.

Finally, we conclude that "a lapse in representation[] resulted from the conflict," <u>Iorizzo</u>, 786 F.2d at 58 (quotation marks omitted), because some "plausible alternative defense strategy or tactic might have been pursued" but for LoTempio's actual conflict of interest, <u>Levy</u>, 25 F.3d at 157 (quotation marks omitted).  Had Arrington and Hicks been tried together and Hicks testified, Arrington might have been able to benefit from Hicks's testimony. As it turns out, Hicks, testifying in his own defense at trial, denied the existence of the Schuele Boys enterprise, that Balance's murder was in retaliation for Davison's, or having seen Arrington at the scene of Balance's murder.  It is impossible to know whether the outcome for Arrington would have changed had Hicks's testimony come during or before Arrington's trial. But at the end, when the conflict is actual, as it is here, "the applicable standard requires only the demonstration of a conflict inconsistent with a plausible trial strategy or tactic," not prejudice.  <u>Malpiedi</u>, 62 F.3d at 470. Arrington had to show that an alternative strategic approach (not severing the trials, or pressing to be tried after Hicks) was "not undertaken due to

[LoTempio's] other loyalties and interests." Id. at 469 (quotation marks omitted). Once such a showing is made, as we think it was here, Strickland's "fairly rigid" presumption of prejudice applies. Strickland v. Washington, 466 U.S. 668, 692 (1984).

Having determined that Arrington's right to effective counsel was violated, we vacate the convictions and remand for a new trial. The Sixth Amendment compels this result regardless of the strength of the trial evidence.

**CONCLUSION**

Because we conclude that Arrington's waiver of his counsel's conflict of interest was not knowing and intelligent, we **VACATE** Arrington's conviction and **REMAND** to the District Court for a new trial.